69 So.3d 235 (2011)
Donald William DUFOUR, Appellant,
v.
STATE of Florida, Appellee.
No. SC09-262.
Supreme Court of Florida.
February 3, 2011.
As Revised on Denial of Rehearing August 25, 2011.
*238 Bill Jennings, Capital Collateral Regional Counsel, Maria D. Chamberlin and Marie-Louise Samuels-Parmer, Assistant CCR Counsel, Middle Region, Tampa, FL, for Appellant.
Pamela Joe Bondi, Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
Gretchen S. Sween, of Dechert, LLP, Austin, Texas, and George G. Gordon of Dechert, LLP, Philadelphia, PA, on behalf of The American Association on Intellectual and Developmental Disabilities (AAIDD), for Amicus Curiae.
PER CURIAM.
This case is before the Court on appeal from an order concluding that Donald William Dufour is not mentally retarded pursuant to Florida Rules of Criminal Procedure *239 3.203 and 3.851. The final order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, and we therefore have jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution. We affirm the order of the postconviction court.

FACTS AND PROCEDURAL HISTORY

Background and the Direct Appeal Proceedings
Several homicides produced Dufour's incarceration. In early September of 1982, the body of Zack Miller was found in an orange grove in Orlando. As the investigation of Miller's death was proceeding, Dufour was involved in the robberies and murders of Daniel King and Earl Wayne Peeples in Jackson, Mississippi, in October of 1982. See Dufour v. State, 453 So.2d 337, 338 (Miss.1984). After being detained in Mississippi on the charges related to the King and Peeples murders, Dufour was arrested by Florida law enforcement officers for the first-degree murder of Miller. While the capital proceedings related to the Miller death progressed, Dufour pled no contest to the murder of Edward Wise, which had occurred in Orlando on July 4, 1982, and was sentenced to life imprisonment.
A capital jury unanimously found Dufour guilty of the murder of Zack Miller and recommended the death penalty, which the trial court imposed in 1984. See Dufour v. State, 495 So.2d 154, 157 (Fla. 1986) (Dufour I).[1] On direct appeal, this Court affirmed the conviction and sentence. See 495 So.2d at 156. The Court detailed the circumstances surrounding the Miller murder as follows:
State witness Stacey Sigler, [Dufour's] former girlfriend, testified that on the evening of September 4, 1982, the date of the murder, [Dufour] announced his intention to find a homosexual, rob and kill him. He then requested that she drop him off at a nearby bar and await his call. About one hour later, [Dufour] called Sigler and asked her to meet him at his brother's home. Upon her arrival, [Dufour] was going through the trunk of a car she did not recognize, and wearing new jewelry. Both the car and the jewelry belonged to the victim.
[Dufour] had met the victim in the bar and driven with him to a nearby orange grove. There, [Dufour] robbed the victim and shot him in the head and, from very close range, through the back. Telling Sigler that he had killed a man and left him in an orange grove, he abandoned the victim's car with her help.
According to witness Robert Taylor, a close associate of [Dufour], [Dufour] said that he had shot a homosexual from Tennessee in an orange grove with a .25 automatic and taken his car. Taylor, who testified that he had purchased from [Dufour] a piece of the stolen jewelry, helped [Dufour] disassemble a .25 automatic pistol and discard the pieces in a junkyard.
State witness Raymond Ryan, another associate of [Dufour], also testified that *240 [Dufour] had told him of the killing, and that [Dufour] had said "anybody hears my voice or sees my face has got to die." Noting [Dufour's] possession of the jewelry, Ryan asked him what he had paid for it. [Dufour] responded[,] "You couldn't afford it. It cost somebody a life." Ryan further testified that he had seen [Dufour] and Taylor dismantle a .25 caliber pistol.
Henry Miller, the final key state's witness, testified as to information acquired from [Dufour] while an inmate in an isolation cell next to [Dufour]. In return for immunity from several armed robbery charges, Miller testified that [Dufour] had told him of the murder in some detail, and that [Dufour] had attempted to procure through him witness Stacey Sigler's death for $5,000.
Id. at 156-57.
On direct appeal, Dufour raised sixteen issues. See id. at 157-64.[2] This Court denied fifteen of the claims, but held that the trial court erroneously found that the murder had been committed for the purpose of avoiding a lawful arrest because the evidence failed to establish the requisite proof of intent. See id. at 163. Nevertheless, this Court upheld the sentence of death based on the three remaining aggravating factors and the complete lack of mitigation. See id.

Postconviction Proceedings
In 1992, Dufour filed an initial motion pursuant to Florida Rule of Criminal Procedure 3.850, and he amended the motion in 2001. See Dufour v. State, 905 So.2d 42, 50 (Fla.2005) (Dufour III). Dufour raised multiple claims, but only one is tangentially relevant to the present appealwhether the failure of the court-appointed psychiatrist to conduct appropriate tests for organic brain damage and mental illness violated due process. See id. In 2003, the circuit court denied Dufour's motion, and Dufour appealed the order to this Court, asserting ten issues. See id.[3] In addition, *241 Dufour filed a petition for a writ of habeas corpus that presented four issues. See id.[4]
While the initial postconviction appeal was pending, Dufour filed a motion for postconviction relief that sought a determination of mental retardation pursuant to Florida Rule of Criminal Procedure 3.203. Correspondingly, Dufour filed a motion requesting this Court to relinquish jurisdiction to the circuit court. We denied the motion to relinquish jurisdiction without prejudice to Dufour filing a motion seeking relief under rule 3.203 within sixty days after his pending postconviction and habeas proceedings became final. See Dufour v. State, Nos. SC03-1326 & SC04-232 (Fla. Apr. 14, 2005) (unpublished order). On the same day, we issued a decision that affirmed the circuit court's denial of Dufour's motion for postconviction relief and denied his habeas petition. See Dufour III, 905 So.2d at 48.
In accord with this Court's order, Dufour filed a timely motion pursuant to Florida Rules of Criminal Procedure 3.203 and 3.851 that asserted his conviction and sentence of death are contrary to the reasoning and holding in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which established that the Eighth Amendment prohibits the execution of the mentally retarded. Moreover, Dufour contended that section 921.137, Florida Statutes (2004), violates both the United States Constitution and the Florida Constitution. The circuit court appointed two expert psychologists to evaluate Dufour: Dr. Harry McClaren on behalf of the State and Dr. Valerie McClain on behalf of the defense. Dufour retained Dr. Denis Keyes as an expert, and the State presented the expert testimony of Dr. Sidney Merin, who had previously testified on behalf of the State during the 2002 postconviction hearing.
The circuit court conducted an evidentiary hearing during which the evidence presented established Dufour's deplorable and difficult childhood. When Dufour was two years old, his family moved from New York to Orlando, Florida. Before moving to Florida, Dufour's father was afflicted by polio and was also injured in an accident that required a steel plate to be placed in his head. The resulting physical disability impacted his demeanor, and Dufour's father developed depression. Thereafter, Dufour's father became an alcoholic, spending most of his days drunk and releasing the anger he felt for his life on his family through physical abuse. As a result, Dufour witnessed domestic violence throughout his childhood and was the victim of physical abuse by his father.
Dufour's father died while Dufour was a teenager, and his mother remarried. In maintaining the new household, Dufour's *242 mother assigned the children chores, such as doing their own laundry, cleaning their room, cooking lunch, and washing the dishes. Dufour and his older brothers would also perform yard work and mow the grass. Dufour was able to accomplish each of these tasks. Dufour also possessed a license to drive and was able to drive without limitation. He appeared to understand the various traffic signals, although his friends sometimes characterized him as a poor driver. Additional evidence indicated that Dufour had participated in legal proceedings concerning a forfeiture of a vehicle purportedly owned by Dufour.
With regard to the ability of Dufour to maintain a home and provide self-care, throughout his life, Dufour has primarily resided with his parents, brothers, and friends. For example, Dufour and his former girlfriend, Stacy Sigler, decided to reside in an apartment together. Although in conflict with other evidence, Sigler testified that Dufour leased the apartment and handled the rent. Sigler testified that while she was at work, Dufour decorated the apartment for her. She further stated that Dufour possessed the ability to maintain a clean kitchen, but that their kitchen would not pass a "white glove" test. She testified that Dufour was able to select his own apparel and dress appropriately. In addition, Dufour was able to independently accomplish proper hygiene activities daily, such as brushing his teeth and showering.
The evidence also established that Dufour possessed the ability to be self-sufficient and live independently of his friends and family. After committing the capital offenses in Mississippi, Dufour obtained food and secured boarding and lodging unaided by others. See Dufour v. State, 453 So.2d 337, 339 (Miss.1984). Specifically, Dufour negotiated with management at a boarding house that he would care for an elderly invalid who resided there in exchange for board and lodging. See id. When Dufour learned that he had been implicated in the Mississippi homicides, he arranged to change his identity by having his dark hair cut and dyed blond. See id. Thereafter, he remained in seclusion at the boarding house to avoid detection by law enforcement for approximately two weeks until he eventually left the premises and was ultimately arrested. See id.
In the view of Dufour's stepsister, Dufour was not mentally retarded and possessed intelligence equal to her own. During Dufour's teenage years, his stepsister observed him reading and believed that he could interpret the material. This was in contrast to Dufour's older brother John, who was described by family members as intellectually slow and who attended a school that assisted profoundly mentally retarded students who engaged in aggressive, violent behavior, or physically acted out in class.
Despite his stepsister's observations of his reading ability, other evidence demonstrated that Dufour had an "abysmal" academic performance in school. Initially established by his performance in first grade, this fact was further proven by his many failing grades throughout his education. For instance, he had to repeat the second grade due to his academic performance, and he still did not accomplish passing grades during his second attempt. In light of his poor grades, he was "socially promoted," or "placed" for the rest of elementary school. The term "placed" indicated that although the student advanced to the next grade level, the student had not successfully achieved the curricular requirements to be promoted. In addition, Dufour was enrolled in basic classes, which were the lowest level of coursework in his school. However, other evidence suggested *243 that this poor performance in school could be related to other factors, such as Dufour's deplorable conditions at home, sexual abuse, and frequent abuse of alcohol and other narcotics. For example, Dufour informed a mental health expert that he spent the majority of his time in high school selling and consuming drugs instead of focusing on academics.
The evidence demonstrated that Dufour still struggles with proper spelling and grammar. As an adult, Dufour would read children's books to his friend's children, but struggled with some of the words. In addition, various materials purported to be authored by Dufour contained misspellings and grammatical errors. Despite these difficulties, Dufour successfully completed medical requests in prison for a special diet and medicine to treat Hepatitis C, with which he was diagnosed. However, there was conflicting evidence as to whether Dufour engaged the assistance of others in completing these requests.
The evidence further indicated that Dufour possesses proficiency in mechanical projects. In junior high, Dufour earned his highest grades in physical education and shop. After two years in junior high school, Dufour transferred to a vocational school. Subsequently, while incarcerated during the 1970s for a burglary conviction, Dufour obtained his General Educational Development (GED) diploma and completed a small engine repair course. In addition to successfully completing the course, Dufour served as an aide to the instructor of the course. Dufour also assisted in organizing and teaching a motorcycle repair course at the correctional institution. Dufour displayed other mechanical skills as a youth by refurbishing a motorcycle.
In addition to his mechanical skills, testimony established that Dufour possessed "street smarts," which is a shrewd awareness of how to survive as a result of living or working in a difficult environment. Dufour was also described as possessing the ability to easily persuade and interact with people.
With regard to Dufour's health, he began to abuse drugs and alcohol from a very young age. According to his older brother, if Dufour was awake, he was using alcohol or drugs. When bringing his father alcohol, Dufour would sip from the beer. He would also take beer from the refrigerator while his parents slept. By the third grade, Dufour would consume a six-pack of beer. By the fourth grade, he began abusing marijuana daily. Starting in the fifth grade, he experimented with inhalants such as toluene and glue on a daily basis. In junior high, his drug use escalated to include many psychedelic and sedative drugs. Dufour's brother recalled that Dufour's arm would be covered in scars or infected from injecting various types of narcotics into his veins with a needle.
In addition to the drug and alcohol abuse, Dufour unsuccessfully attempted to establish that he suffered from organic and traumatic brain damage. Although there was some testimony with regard to incidents in which Dufour was injured, such as vehicular and physical accidents, none of this testimony established or substantiated that the accidents resulted in injury to his brain. Moreover, Dufour failed to present any evidence or medical records documenting any injuries to his brain.
The evidence also developed Dufour's employment history. He secured employment at roofing and painting companies but would only hold the position for a few months at a time. Further, Dufour's former lover employed him as a chauffeur. At one point, a neighbor's husband attempted to secure employment for Dufour working with drywall. However, when Dufour arrived at the construction site, it *244 became apparent that he had no experience with drywall and he was terminated. Dufour's brother also attempted to secure employment for Dufour as a yard assistant, but Dufour would often stop attending work. Other evidence established that Dufour's difficulty in maintaining employment was a result of his dissatisfaction with the type of positions he obtained. In sum, Dufour failed to maintain stable employment.
With regard to Dufour's ability to maintain healthy relationships, as a child, Dufour was sexually abused by an adult man in his twenties. In seventh grade, Dufour began to engage in sexual relations with women. During junior high school, he engaged in alcohol-related sexual activities simultaneously with multiple, older sexual partners. When Dufour was in his late teenage years, his stepsister accused him of rape. When he was approximately sixteen years old, Dufour's mother sent him to live with his older brother in Gainesville. Dufour became heavily involved in a predominantly homosexual "party" scene. During this period, one of his brother's friends raped him. Dufour spent much of this time intoxicated and would exchange sexual favors for special favors from older men. For example, the older men would use Dufour to solicit younger boys.
Later in life, he shared a romantic relationship with Stacy Sigler, which included Sigler working as a prostitute and sharing her proceeds with Dufour. Sigler and Dufour would have sex with multiple partners, including Dufour's brothers. While with Sigler, Dufour planned and executed a trip for the couple to Houston, Texas. Sigler did not know who had booked the plane tickets, reservations, or other arrangements, and there was no evidence presented as to how the tickets were purchased. However, Dufour was in possession of the tickets and navigated the airport, such as finding the correct gate and flight for the duo. He also made all ground transportation arrangements, including paying for the transportation. Further, Dufour ushered Sigler to the locations that he wanted to visit without consulting others.
Dufour presented testimony to establish that no property receipts or library records existed from Florida's death row to indicate that Dufour utilized the library resources or engaged in intellectual and strategic games. In addition, a death row inmate testified that Dufour required assistance in writing inmate requests for canteen supplies and appeared to have very poor hygiene. For instance, the inmate testified that Dufour did not understand that he had to wash his clothes. Instead, Dufour assumed that the sweat from his workouts cleaned his clothing. However, the State presented testimony with regard to contrasting property receipts which established that while incarcerated, Dufour possessed items such as paperback books, playing cards, a traditional dictionary, and a bible dictionary.
Both defense experts, Dr. Keyes and Dr. McClain, concluded that Dufour was mentally retarded. Both state experts, Dr. Merin and Dr. McClaren, concluded that Dufour was not mentally retarded. The experts tested the intellectual functioning of Dufour and obtained the following scores: Dr. McClain(a) Verbal IQ68; (b) Performance IQ72 (c) Full Scale IQ67; Dr. McClaren(a) Verbal IQ 65; (b) Performance IQ65; (c) Full Scale IQ62; Dr. Merin's original test scores(a) Verbal IQ85; (b) Performance IQ64; (c) Full Scale IQ74. Each of the experts reviewed and commented on the testing conducted by the other experts. With regard to Dr. Merin's intelligence testing for the 2002 proceeding, all of the *245 experts noted that there were administration and scoring errors.
Following the evidentiary hearing, the circuit court concluded that Dufour did not establish by either clear and convincing evidence or a preponderance of evidence that he was mentally retarded. Dufour now appeals that decision.

ANALYSIS

The Mental Retardation Determination
Dufour challenges the circuit court's determination that he is not mentally retarded in accordance with the definition set forth in Florida Rule of Criminal Procedure 3.203 and section 921.137(1), Florida Statutes (2005). In 2001, the Legislature enacted section 921.137, which barred the imposition of death sentences on the mentally retarded and established a method for determining which capital defendants are mentally retarded. See § 921.137, Fla. Stat. (2001). The following year, the United States Supreme Court held that execution of mentally retarded offenders constitutes "excessive" punishment under the Eighth Amendment, but left "the task of developing appropriate ways to enforce the constitutional restriction" to the states. Atkins v. Virginia, 536 U.S. 304, 317, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
In response to this authority, this Court promulgated Florida Rule of Criminal Procedure 3.203, which specifies the procedure for presenting claims of mental retardation as a bar to a death sentence. The statute and rule are substantially similar with regard to the definition of mental retardation. Rule 3.203(b) provides:
As used in this rule, the term "mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this rule, means performance that is two or more standard deviations from the mean score on a standardized intelligence test authorized by the Department of Children and Family Services in rule 65G-4.011 of the Florida Administrative Code. The term "adaptive behavior," for the purpose of this rule, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
Accord § 921.137(1), Fla. Stat. (2005).[5] From this authority, we derived a three-prong standard that the defendant must establish to be categorically excluded from the death penalty based on mental retardation. Specifically, Dufour must have presented evidence of the following: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before the age of eighteen. See Fla. R.Crim. P. 3.203(b); § 921.137(1), Fla. Stat. Clear and convincing evidence means evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief, without hesitation, about the matter in issue. See In re Standard Jury Instructions In Civil Cases-Report No. 09-01, 35 So.3d 666, 668 (Fla.2010). Moreover, a defendant must *246 establish all three elements, and the failure to prove any one prong would result in the determination that the defendant is not mentally retarded. See Nixon v. State, 2 So.3d 137, 142 (Fla.2009).
When reviewing determinations of mental retardation, we examine the record for whether competent, substantial evidence supports the determination of the trial court. See Nixon, 2 So.3d at 141 (citing Cherry v. State, 959 So.2d 702, 712 (Fla.2007); Johnston v. State, 960 So.2d 757, 761 (Fla.2006)). This Court cannot "reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." Brown v. State, 959 So.2d 146, 149 (Fla.2007) (citing Trotter v. State, 932 So.2d 1045, 1049 (Fla.2006)). However, to the extent that the circuit court decision concerns any questions of law, we apply a de novo standard of review. See Cherry, 959 So.2d at 712.

Intellectual Functioning
Under Florida law, the first element of a mental retardation determination requires that the person exhibit "significantly subaverage general intellectual functioning," which is defined as "performance that is two or more standard deviations from the mean score on a standardized intelligence test" specified by the Department of Children and Family Services. See § 921.137(1). The Department has designated the Stanford-Binet Intelligence Scale and the Wechsler Intelligence Scale (WMS) as the approved tests. See Fla. Admin. Code R. 65B-4.032. On the WAIS, a score of 70 is two standard deviations from the mean. Accordingly, "significantly subaverage general intellectual functioning" correlates with an IQ of 70 or below.
Dufour's scores on the WAIS-III were as follows: Dr. McClain(a) Verbal IQ 68; (b) Performance IQ72 (c) Full Scale IQ67; Dr. McClaren(a) Verbal IQ 65; (b) Performance IQ65; (c) Full Scale IQ62; Dr. Merin's original test scores(a) Verbal IQ85; (b) Performance IQ64; (c) Full Scale IQ74. The circuit court determined that Dufour had not proven by clear and convincing evidence that he possesses significantly subaverage general intellectual functioning. The court noted that the results of the scores indicated that Dufour is at, or near, the mildly mentally retarded range. However, the court considered the scores in conjunction: "Taking Dr. McClain's score of 67, which is approximately halfway between the scores of Dr. McClaren and Dr. Merin, the band of confidence still ranges from 62 to 72, with the upper range being above the Cherry cut-off score of 70." Further, the court noted that some test results suggested the possibility of malingering and that Dufour had reasonable motivation to perform poorly to avoid execution.
As to the weight of the expert testimony, the circuit court found that some testing irregularities had occurred with Dr. Merin. The court also found that the diagnoses of mental retardation by Drs. McClain and Keyes were not persuasive, and that Dr. McClain had discounted her own test results. The court considered that Dr. McClaren did not believe the validity of his own scoring results because the scores were contrary to the expected practice effect and Dufour did not appear to be making his best effort, due to either malingering or illness.
On appeal, Dufour advances somewhat inconsistent positions with regard to the application of Cherry. On one hand, he asserts that the circuit court's application of the standard error of measurement to Dr. McClain's score violates Cherry. On the other, Dufour maintains that this Court should reconsider and recede from Cherry because it violates Atkins. *247 We reject Dufour's request that this Court reconsider Cherry. Although all of the experts testified that a standard error of measurement must be applied to intelligence scores, this Court has consistently interpreted the plain language of section 921.137(1) to require the defendant to establish that he or she has an IQ of 70 or below.
Both section 921.137 and rule 3.203 provide that significantly subaverage general intellectual functioning means "performance that is two or more standard deviations from the mean score on a standardized intelligence test." One standard deviation on the WAIS-III, the IQ test administered in the instant case, is fifteen points, so two standard deviations away from the mean of 100 is an IQ score of 70. As pointed out by the circuit court, the statute does not use the word approximate, nor does it reference the SEM. Thus, the language of the statute and the corresponding rule are clear. We defer to the plain meaning of statutes.
Cherry, 959 So.2d at 712-13; see also Nixon, 2 So.3d at 142; Phillips v. State, 984 So.2d 503, 510 (Fla.2008); Jones v. State, 966 So.2d 319, 329 (Fla.2007); Brown, 959 So.2d at 148-49; Johnston, 960 So.2d at 761; Burns v. State, 944 So.2d 234, 245 (Fla.2006); Rodgers v. State, 948 So.2d 655, 666-67 (Fla.2006); Trotter, 932 So.2d at 1049; Zack v. State, 911 So.2d 1190, 1201 (Fla.2005). Most recently, in Nixon, this Court considered and rejected a similar request to reconsider and recede from Cherry. See Nixon, 2 So.3d at 142-43. Despite advancing reasonable arguments with regard to standard psychological practices for testing and measuring intellectual functioning, Dufour has not demonstrated a reason to overturn this Court's interpretation of the plain language of section 921.137.
However, we find merit to Dufour's first argument on this issue because the circuit court incorrectly applied the standard error of measurement to the IQ score that resulted from Dr. McClain's evaluation of Dufour. Nothing in our prior precedent suggests that the plain language of the statute applies solely to capital defendants. As Dufour asserts, it would be unduly prejudicial for the statute to be interpreted to allow the State or the circuit court to benefit from the standard error of measurement but to prohibit the defendant from doing so.
In this posture, it is important to note that this Court cannot "reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." Brown v. State, 959 So.2d 146, 149 (Fla. 2007) (citing Trotter v. State, 932 So.2d 1045, 1049 (Fla.2006)). Here, the circuit court did not completely discredit the reliability of the IQ scores. Although the circuit court noted the concerns with malingering and set forth specific issues with each expert's evaluation, the court ultimately stated that it found some credibility to the testimony supporting each score. Consequently, the postconviction court concluded that it had to consider all the scores together but incorrectly applied the standard error of measurement to the middle score. In light of the legal error, this Court cannot parse from the record the amount of credibility to apportion to each score based on the postconviction court's vague statement that it found some credibility to the testimony supporting each score. Consequently, there is a reasonable possibility that the error affected the circuit court's determination of Dufour's intellectual functioning. Specifically, the language of the order does not demonstrate beyond a reasonable doubt that the error did not contribute to the circuit court's conclusion that Dufour failed to establish subaverage intellectual functioning. *248 See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). Accordingly, the circuit court's legal error with regard to the standard error of measurement cannot be deemed harmless as to the intellectual functioning element.

Adaptive Behavior
Despite our conclusion as to the intellectual functioning element, we affirm the circuit court's determination that Dufour failed to establish that he demonstrates deficient adaptive functioning. As described in section 921.137(1) and rule 3.203(b), the term adaptive behavior "means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." The definition in section 921.137 and Florida Rule of Criminal Procedure 3.203 states that the subaverage intellectual functioning must exist "concurrently" with adaptive deficits to satisfy the second prong of the definition, which this Court has interpreted to mean that subaverage intellectual functioning must exist at the same time as the adaptive deficits, and that there must be current adaptive deficits. See Jones v. State, 966 So.2d 319, 326 (Fla.2007).
After considering the testimony of all the witnesses, the postconviction court found that Dufour failed to present by either clear and convincing evidence or a preponderance of the evidence that Dufour has deficits in adaptive behavior to a level necessary to support a finding of mental retardation. The circuit court accepted much of the factual evidence presented by Dufour, but determined that the evidence established that the reason for his behavior was the consequence of intense drug use and deplorable home conditions which included sexual and physical abuse. The circuit court's consideration of an alternative explanation for Dufour's adaptive behavior demonstrates that Dufour failed to meet his burden of proof.
In addition, competent, substantial evidence supports this conclusion. Virtually all of the witnesses testified with regard to Dufour's extensive drug use. Dufour's self-reporting in earlier psychological evaluations and the deposition testimony of Dufour's family established that Dufour suffered from sexual abuse as a child and engaged in atypical sexual relationships from a young age. Dufour's brothers testified as to the physical abuse Dufour suffered at the hands of his father. Moreover, testimony established that Dufour only attended high school to sell drugs, which provides an alternative explanation for his low grades. His father's abuse, his family's poverty, and his early substance abuse provided an explanation for Dufour's poor performance in school. In sum, the circuit court determined that the teacher's testimony with regard to Dufour's grades did not outweigh or refute the alternative explanations for Dufour's poor academic performance, nor did it sufficiently establish that this performance was attributable to mental retardation.
The postconviction court also considered that this Court upheld the circuit court's finding of the aggravating circumstance that the murder was committed in a cold, calculated, and premeditated manner. In Phillips v. State, 984 So.2d 503, 512 (Fla. 2008), this Court held that "[t]he actions required to satisfy the CCP aggravator are not indicative of mental retardation." Accordingly, the circuit court correctly applied this Court's precedent in consideration of one of the aggravating circumstances of the Miller murder.
Additionally, there is significant conflict in the evidence with regard to Dufour's adaptive behavior. For instance, Dufour advanced that he did not meet the standard of personal independence expected of *249 his age, cultural group, and community because he had always been cared for by others and had never possessed the responsibility of handling bills. Conversely, the evidence with regard to Dufour's independent actions in Mississippi demonstrated his proficiency to care for himself and his ability to engage in well-thought-out actions to avoid arrest. See Dufour, 453 So.2d at 339. Moreover, Stacy Sigler testified that Dufour handled the leasing of their apartment and paid the rent. Dufour also accomplished the chores assigned by his mother, such as laundry, cleaning his room, cooking lunch, washing dishes, and maintaining the yard. Whereas Dufour presented testimony demonstrating that he lacked proper hygiene skills, the State established that Dufour was able to select his own apparel, dress appropriately, and independently accomplish proper hygiene activities such as brushing his teeth and showering.
Further, Dufour asserted that his poor grades in elementary school established deficient adaptive functioning. However, prison records demonstrate that Dufour successfully achieved a GED diploma and assisted as an aide in a small engine repair course in addition to virtually organizing and developing the curriculum for a motorcycle repair course. With regard to his employment history, Dufour contended that he had never maintained meaningful employment for more than a few months. On the other hand, the State presented testimony which established that Dufour's difficulty in maintaining employment was a result of his dissatisfaction with the type of positions he obtained. Furthermore, Dufour advanced that the absence of a chessboard in his prison property records indicated that he lacked the ability to engage in intellectual and strategic games. In contrast, the State presented evidence that while incarcerated, Dufour possessed items such as paperback books, playing cards, a traditional dictionary, and a bible dictionary. Accordingly, the conflicts in the evidence substantiate the determination of the circuit court that Dufour failed to satisfy his burden with regard to the adaptive behavior element.
In disagreeing with the circuit court's determination that Dufour lacks a deficit in adaptive behavior, the dissent misdirects attention as to the manner in which a trial court should evaluate whether an individual has a deficit in adaptive behavior. The dissent ignores the direct evidence and places the focus in evaluating adaptive behavior exclusively on the individual's alleged limitations, rather than evaluating the evidence fairly and impartially. In evaluating whether Dufour has a deficit in adaptive behavior, the dissent would not permit the circuit court to even consider the clear evidence that a deficit does not exist. If this Court adopted the dissent's methodology and required trial courts to only consider a defendant's limitations in determining a deficit, according to the dissent, the mere assertion of a limitation would be sufficient to produce a deficit. This would render the second prong of section 921.137's definition of mental retardation automatically satisfied and, as a consequence, superfluous. By attempting to shift the focus to only Dufour's alleged limitations in defining a deficit, the dissent also fails to recognize that the circuit court acted within its province as a fact-finder in determining that Dufour did not have a deficit in adaptive behavior. Specifically, in making its determination, the circuit court utilized the proper methodology of examining all evidence pertaining to a possible deficit in adaptive behavior for Dufour, including evidence of Dufour's strengths that clearly rebutted allegations of his limitations. It did not, as the dissent contends, improperly weigh Dufour's strengths against his limitations.
*250 Rule 3.203 mandates the circuit court's methodology. That rule states that a trial court, as the fact-finder in deciding a motion to determine mental retardation, "shall conduct an evidentiary hearing on the motion for a determination of mental retardation." During that hearing, the trial court does not weigh a defendant's strengths against his limitations in determining whether a deficit in adaptive behavior exists. Rather, after it considers "the findings of experts and all other evidence," Fla. R.Crim. P. 3.203(e), it determines whether a defendant has a deficit in adaptive behavior by examining evidence of a defendant's limitations, as well as evidence that may rebut those limitations, see, e.g., Phillips, 984 So.2d at 511-12 (holding that a trial court's order finding a lack of a deficit in adaptive behavior was supported by competent, substantial evidence of the defendant's strengths that refuted the defendant's purported limitations). If evidence of a strength rebuts evidence of a perceived limitation, that limitation may not serve as justification for finding a deficit in adaptive behavior. See, e.g., id.
For example, here, the dissent points to witness testimony and the assessment of medical doctors in contending that Dufour has a deficit in adaptive behavior because of a profound inability to live independently in society. Specifically, the dissent points to allegations and opinions of Dufour's limitations with regard to personal financial accounting, academic failures and menial jobs, and his failure to maintain personal-adult relationships. The dissent suggests further that Dufour has asserted limitations in communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. The dissent also highlights allegations of Dufour's limitations with regard to reading and inadequacies in spelling and grammar as significant evidence of Dufour's deficit in adaptive behavior.
The circuit court, however, in properly examining whether the evidence supported or rebutted Dufour's alleged limitations, determined that a deficit in adaptive behavior did not exist. A deficit in adaptive behavior did not exist based on the evidence, and that evidence rebutted Dufour's alleged limitations and the notion that Dufour has a deficit in adaptive behavior. Specifically, Dufour's handling of the leasing of his apartment, payment of rent, administration of household chores, and daily maintenance of personal hygiene refuted the contention that he has an inability to live independently in society. Dufour's ability to live independently in society was also exemplified by the evidence showing his serving as an aide in an engine repair class in addition to virtually organizing and developing the curriculum for a motorcycle repair shop. Dufour's preparing and executing lesson plans alone were reflective of his cogitative ability as a fully-functioning, contributing member of society.
Further rebutting Dufour's alleged limitations was his work to secure a GED diploma. This refutes the notion that he has a deficit in literacy and an inability to communicate efficaciously in society. The specifications of the GED have changed slightly throughout the years as different versions of the test have been issued. Compare Archived Information, Educational and Labor Market Performance of GED recipients, http://www2.ed.gov/pubs/ GED/backgrd.html, with Florida Literacy CoalitionGet your G.E.D., Frequently Asked Questions, http://www.florida literacy.org/ged_information_faq.html. Nevertheless, to obtain a GED diploma, an individual has always been required to successfully master an intensive examination. See Archived Information; Florida Literacy *251 Coalition, supra. The test sections of the GED exam involve a battery of questions that generally emphasize the ability to read, write, think, and solve mathematical problems. See Archived Information, supra. According to the American Council on Education, the GED Tests attempt to assess academic skills and knowledge typically developed in a four-year program of high school education. See American Council on EducationHistory of the GED Tests, http://www.acenet.edu/ Content/NavigationMenu/ged/about/ history_GED_Tests.htm. Successfully passing a GED exam has traditionally been no simple matter.
By successfully mastering this rigorous test, Dufour exhibited individual cognitive strengths that rebutted his asserted limitations of poor academic performance, difficulty reading, struggles with spelling and grammar, and inability to communicate and live independently in society. Dufour's GED diploma is therefore clear evidence of how evidence of a personal strength rebuts an alleged limitation and is direct proof that a deficit in adaptive behavior does not exist in fact.
The dissent is incorrect with regard to the record concerning the GED evidence. Contrary to the dissent's assertion that the State did not present evidence with regard to the significance of Dufour obtaining a GED, the GED evidence was presented by the State directly in support of its argument that Dufour lacked a deficit in adaptive behavior. Both Dr. Merin and Dr. McClaren, whose testimony the State relied upon to establish that Dufour did not have a deficit in adaptive behavior, discussed the relevance of Dufour obtaining a GED. Dr. Merin testified that in his mental health evaluation of Dufour, he examined prison progress reports which stated that Dufour had excelled while in prison, where he participated as an instructor in small engine and motorcycle repair classes, and where he obtained his GED. See Transcript of Record at 2804-05. For Dr. Merin, this demonstrated that Dufour was a "very capable type of individual" who could function well and "solve problems whether they be social problems or maybe mechanical problems," and that Dufour was "definitely capable of college work." Transcript of Record at 2805-06. The dissent has ignored this part of the record.
Dr. McClaren testified that the GED obtained by Dufour signified the absence of a deficit in adaptive behavior and demonstrated an aptitude for college work. See Transcript of Record at 3047-48, 3094. Dr. McClaren also specifically opined during cross-examination by Dufour's counsel that obtaining a GED was "suggestive of Mr. Dufour's ability to function at a higher level." Transcript of Record at 3094. Dr. McClaren further attested during cross-examination that Dufour admitted to him that he cheated on the GED, see Transcript of Record at 3094-95, which displays a mental aptitude by Dufour that negates his assertion that he has a deficit in adaptive behavior.
The State advanced the "GED" argument from its first pleading. Dufour's GED information was in the attachments to the State's response to Dufour's rule 3.851 postconviction motion. See State's Answer to Rule 3.851 Motion at 75, 78; State's Amended Answer to Rule 3.851 Motion at 250, 253. It was addressed during the evidentiary proceeding below when the State entered a copy of Dufour's GED certificate into evidence to corroborate the testimony of Dr. McClaren. See Transcript of Record at 3047-48. Moreover, in the State's answer brief on appeal the GED was advanced in support of its argument that this Court should affirm the trial court's finding that Dufour did not *252 have a deficit in adaptive behavior. See State Answer Brief at 60. In fact, Dufour's initial brief on appeal, he acknowledged that Dr. McClaren relied on Dufour's successful completion of the GED exam in partial support of his conclusion that Dufour did not have a deficit in adaptive behavior. See Dufour's Initial Brief at 35.
Furthermore, Dufour presented evidence of his GED during his initial rule 3.850 postconviction proceeding in Dufour v. State, 905 So.2d 42 (Fla. 2005). There, he offered the testimony of a mental health expert, Dr. Robert Berland. See id. at 61. Dr. Berland testified with regard to Dufour's good prison record. See id. Dufour attempted to use that testimony to establish that trial counsel was ineffective for failure to present Dufour's good prison record as mitigation evidence during the penalty phase. See id. During Dr. Berland's testimony, he testified that Dufour had received his GED certificate and, at the time he obtained it, he demonstrated an ability to conform his conduct to the requirements of law, but that a subsequent head trauma, suffered after that incarceration and before Dufour committed murder, had stymied Dufour's ability to conform his conduct. See Transcript of Record at 494-95, 509-10.
The presentation of evidence with regard to Dufour obtaining a GED certificate commenced in Dufour's initial postconviction proceeding, and persisted during this postconviction proceeding in the form of both evidence and argument by the State, negating the assertion of the dissent that the significance of Dufour's GED was not presented or was not properly argued by the State. The dissent fallaciously attempts to bolster its argument by contending that the State failed to present evidence with regard to the specific version of the GED that Dufour earned. This argument is misleading at best. During the evidentiary proceeding, the State entered into evidence an exact copy of the specific GED earned by Dufour. See Transcript of Record at 3047-48; Record of Exhibit K1 at 5240. That GED therefore logically served as the specific basis for the testimony the State introduced regarding the rigors Dufour had to specifically overcome, and the individual aptitude he had to show, to earn a GED.
In addition, the circuit court concluded that Dufour failed to establish that he is mentally retarded by a preponderance of the evidence. Preponderance of evidence is defined as evidence "which as a whole shows that the fact sought to be proved is more probable than not." State v. Edwards, 536 So.2d 288, 292 n. 3 (Fla. 1st DCA 1988). The extensiveness of the evidence concerning Dufour's drug use and abusive childhood and the conflicting evidence with regard to his adaptive behavior provides competent, substantial evidence in support of the circuit court's conclusion under the lesser standard. The fact that the circuit court attributed Dufour's behavior to an alternative explanation demonstrates that there is another, equally likely reason for his behavior other than mental retardation. Therefore, Dufour did not present evidence that demonstrates the existence of mental retardation as required. See id.
Accordingly, we affirm the postconviction court's order because competent, substantial evidence supports the circuit court's determination that Dufour has failed to establish the adaptive behavior deficiency element of section 921.137 and rule 3.203. A defendant must establish all three of the elements and the failure to prove any single element results in a determination that the defendant is not mentally *253 retarded. See Nixon, 2 So.3d at 142. In light of our holding that competent, substantial evidence supports the circuit court's determination that Dufour's behavior is attributable to factors other than mental retardation along with the conflicting evidence on whether deficiency exists, we do not address the last prong of the test, which is whether the subaverage intellectual functioning and deficient adaptive behavior manifested prior to the age of eighteen. See id. at 145; Phillips, 984 So.2d at 509 n. 11, Jones, 966 So.2d at 329-30; Trotter, 932 So.2d at 1049 n. 5.

Constitutionality of Section 921.137(4)
Dufour asserts that the circuit court unconstitutionally applied the clear and convincing evidence standard in evaluating whether Dufour is mentally retarded. He advances that the decisions in Atkins and Cooper v. Oklahoma, 517 U.S. 348, 363, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), demonstrate that this burden violates his due process rights under the Florida and United States Constitutions. Here, the circuit court found that Dufour failed to demonstrate deficient adaptive behavior under either the clear and convincing or the preponderance of the evidence standard. Because we hold that competent, substantial evidence supports the circuit court's determination with regard to adaptive behavior deficiency under the lower standard, we decline to reach the constitutional challenge raised by Dufour. See Singletary v. State, 322 So.2d 551, 552 (Fla.1975) ("[C]ourts should not pass upon the constitutionality of statutes if the case in which the question arises may be effectively disposed of on other grounds."); see also Nixon, 2 So.3d at 145; Phillips, 984 So.2d at 509 n. 11; Jones, 966 So.2d at 329-30; Trotter, 932 So.2d at 1049 n. 5.

Evidentiary Issues
Dufour next contends that the circuit court improperly allowed a number of documents to be admitted into evidence and improperly allowed a former defense expert to testify for the State. In reviewing this issue, a circuit court's admission of evidence will not be reversed absent an abuse of discretion. See Medina v. State, 466 So.2d 1046, 1050 (Fla.1985). We hold that even if the circuit court abused its discretion, any error is harmless because the language of the order demonstrates beyond a reasonable doubt that the challenged evidence did not contribute to the postconviction court's conclusion that Dufour failed to establish mental retardation. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). Thus, there is no reasonable possibility that the asserted errors affected the court's determination.
However, we note two things. First, the postconviction court afforded judicial notice to the 2002 postconviction proceeding and certain letters within the court file. In Florida, a court may take judicial notice of various matters including "[r]ecords of any court of this state or of any court of record of the United States or of any state, territory, or jurisdiction of the United States." § 90.202(6), Fla. Stat. (2007). However, the fact that a record may be judicially noticed does not render all that is in the record admissible. See Allstate Ins. Co. v. Greyhound Rent-A-Car, Inc., 586 So.2d 482, 483 (Fla. 4th DCA 1991). For instance, the court's authority to take judicial notice of records cannot be used to justify the wholesale admission of hearsay statements within those court files, such as through police reports or letters. See Stoll v. State, 762 So.2d 870, 876 (Fla.2000) ("We have never held that such otherwise inadmissible documents are automatically admissible just because they were included in a judicially noticed court file."). In Stoll, we held that "documents contained in a court file, even if that entire *254 court file is judicially noticed, are still subject to the same rules of evidence to which all evidence must adhere." Id. at 877. In so holding, we noted the observations of another appellate court that there has been a
seemingly widespread but mistaken notion that an item is judicially noticeable merely because it is part of the "court file." Court files are often replete with letters, affidavits, legal briefs, privileged or confidential data, in camera materials, fingerprint records, probation reports, as well as depositions that may contain unredacted gossip and all manner of hearsay and opinion.
Ptasznik v. Schultz, 247 A.D.2d 197, 679 N.Y.S.2d 665, 666-67 (1998) (citations omitted). "[N]one of these [items] are rendered admissible merely because they are part of the court file." Stoll, 762 So.2d at 877 (citing Ptasznik, 679 N.Y.S.2d at 667). Thus, while the court may take judicial notice of documents in a court file that were properly placed there, this notice would not make the contents of the documents admissible if they were subject to challenge, such as when a document is protected by privilege or constituted hearsay. In addition, taking judicial notice of an entire prior proceeding may be expeditious for the current proceedings, but it does not allow the substance of the underlying materials to be entered into evidence without compliance with the rules of evidence.
Furthermore, the manner in which documents were introduced through the expert testimony was problematic. The State introduced copious documents that the experts relied upon during their evaluation of Dufour and, during the expert testimony, projected these documents on a screen in the courtroom where the trier of fact (i.e., the judge in this bench proceeding) could view the entirety of the substance of the document. The documents came from many unidentified sources and included prior psychological evaluations, inmate grievance requests, multiple police reports, and evidence from the 2002 proceeding. Dufour challenged the use of these documents, asserting that the State was utilizing the expert witness as a conduit to introduce otherwise inadmissible evidence and that the State had not established a foundation for the documents' admissibility outside the fact that the documents were possibly consulted by the expert witness as a basis for an opinion. In addition, Dufour advanced that publishing the documents through the projector screen amounted to the documents' admission in open court for everyone to read without the proper predicate being established, and that the projection of the documents with altered highlighted portions constituted improper bolstering and leading.
In general, the challenged documents fell into the following categories: (1) those that had been admitted into evidence in the 2002 proceedings; (2) those that had been admitted during the course of the 2008 hearing; and (3) those that were introduced solely for identification and were not admitted into evidence. For the documents of which the court took judicial notice, the court expressly noted in its order that the documents from the 2002 hearing were not considered in its determination. Accordingly, the error, if any, in the admission of such evidence was harmless. See Capitoli v. State, 175 So.2d 210, 212 (Fla. 2d DCA 1965) ("Since the trial judge, sitting without a jury, stated that he based his findings exclusively upon such evidence and that he disregarded the challenged evidence, the error, if any, in the admission of such evidence was harmless."). For the documents that were admitted into evidence during the evidentiary hearing, but were not part of the prior *255 judicially noticed proceeding, the court's order does not indicate that any of these documents were considered in its determination. Thus, there is not a reasonable possibility that any error in admitting these documents affected the circuit court's determination.
For the last set of documents, the postconviction court allowed the State to project the documents relied upon by Dr. McClaren onto a screen in the courtroom. In forming opinions, experts can rely on information which is not itself admissible, under section 90.704, Florida Statutes (2004), which provides:
The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
Although experts may testify as to the things on which they rely, experts cannot bolster or corroborate their opinions with the opinions of other experts who do not testify because "[s]uch testimony improperly permits one expert to become a conduit for the opinion of another expert who is not subject to cross-examination." Schwarz v. State, 695 So.2d 452, 455 (Fla. 4th DCA 1997). To allow an expert to do so would cause any probative value of the testimony to be "substantially outweighed by the danger of unfair prejudice, confusion of issues, [or] misleading the jury." Id. at 455 (quoting § 90.403, Fla. Stat. (1995)). Further, an expert's testimony may not be used as a basis to introduce otherwise inadmissible evidence. See Linn v. Fossum, 946 So.2d 1032, 1037 (Fla.2006). Under these circumstances, the circuit court did not abuse its discretion by allowing the challenged documents to be published on the screen. However, we hasten to remind attorneys and judges that the rules of evidence must be applied before the substance of any document may be admitted for consideration by the trier of fact.
Second, the continuous failure to state on the record the identification and exhibit numbers for evidence, along with the references to evidence from prior proceedings without any indication of its identifying information, created unnecessary hardship for this Court in conducting our review. Without an attorney's diligence in creating a clear and comprehensible record, an appellate court is left to piece together the evidentiary record to properly review the proceeding. Thus, it is important for attorneys to ensure that the record reflects identifying information as to which piece of evidence is being referenced and addressed during the proceeding because an appellate court's perspective of a proceeding is limited by the contents of the record.

CONCLUSION
Accordingly, we affirm the circuit court's determination that Dufour has not established that he is mentally retarded.
It is so ordered.
LEWIS, POLSTON, and LABARGA, JJ., concur.
CANADY, C.J., concurs in result.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which QUINCE and PERRY, JJ., concur.
PARIENTE, J., concurring in part and dissenting in part.
The sole issue in this appeal concerns the propriety of the trial court's determination that Dufour was not mentally retarded. Because of significant errors in *256 the trial court's evaluation of Dufour's IQ and adaptive functioning, we should remand to the trial court for a reevaluation of the evidence regarding the IQ and adaptive functioning prongs using the correct legal standards. In our emerging jurisprudence on the evaluation of mental retardation in connection with the death penalty, we must be certain that we are utilizing objective and scientifically acceptable measures for evaluation of both IQ and deficits in adaptive behavior.
I therefore agree with the majority that the trial court erred in its evaluation of Dufour's IQ and that this error is not harmless beyond a reasonable doubt. I disagree, however, that we should affirm based on the failure of Dufour to prove deficits in adaptive behavior because, as discussed below, the trial court made three significant errors when analyzing this prong. I also dissent from the portions of the majority opinion that utilize non-record evidence of the specific requirements and difficulty of the GED given to Dufour in order to refute the existence of Dufour's adaptive functioning deficits. This evidence concerning how rigorous the specific version of the GED that Dufour took was neither presented nor argued by the State and accordingly I am concerned that Dufour was deprived of the opportunity to refute the majority's conclusions regarding the significance and difficulty of the specific version of the GED that Dufour took. This potential problem with the record evidence regarding the rigors of a specific version of the GED could be avoided by remanding for a reevaulation by the trial court of all the evidence, thereby providing the parties an opportunity to be heard.[6]
As to the trial court's error in evaluating the IQ, the trial court accepted Dr. McClain's score of 67 as the most reliable but then applied the standard error of measure to the score, adding five points. In this case, it would therefore appear that a likelihood exists that Dufour's IQ is significantly subaverage. Thus, the two other prongs of the three-part test for mental retardation become important to evaluate: concurrent deficits in adaptive behavior in at least two areas and onset before age 18.
Although I agree that there may be cases where we could affirm the trial court based on findings on adaptive functioning alone, I do not agree that this is one of those cases. In this case, there is reason to question the trial court's evaluation of adaptive functioning because the trial court failed to focus on "deficits" in adaptive behavior, failed to properly evaluate Dr. Keyes' objective testimony of deficits in adaptive behavior, and rejected the evidence relating to deficits in adaptive behavior based on an "alternative explanation" for the deficits. I will explain each of my concerns in turn.
In my view, the trial court first erred by failing to focus on Dufour's established "deficits in adaptive behavior." In other words, the focus in evaluating adaptive behavior should be on the individual's limitations, rather than his or her demonstrated adaptive skills. This proposition is supported both by the American Association on Intellectual and Developmental Disabilities' (AAIDD) definition of mental *257 retardation, as well as the language of section 921.137, Florida Statutes (2006), and Florida Rule of Criminal Procedure 3.203. See § 921.137(1), Fla. Stat. (2006) ("[T]he term `mental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." (emphasis added)); Fla. R.Crim. P. 3.203(b) ("[T]he term `mental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." (emphasis added)).
In stating that the focus is on an individual's limitations, I do not mean that a court is precluded from reviewing the full picture or considering whether a deficit does or does not exist. In fact, courts must review all available evidence in order to determine this prong. But a court cannot reject a determination that deficits exist simply because a defendant has strengths in certain other areas. In other words, possessing certain adaptive skills in one area does not eliminate the possibility that the defendant has deficits in other areas.
Section 921.137(1) defines adaptive behavior as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." § 921.137(1), Fla. Stat. (2006). For the purpose of implementing the adaptive behavior prong, since the enactment of the statute, Florida courts have adopted the analytic framework set forth in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). See Nixon v. State, 2 So.3d 137, 143 (Fla.2009); Phillips v. State, 984 So.2d 503, 511 (Fla.2008); Jones v. State, 966 So.2d 319, 326-27 (Fla.2007). Specifically, when defining mental retardation, the United States Supreme Court explained deficits in adaptive behavior as "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (quoting Am. Ass'n on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992)).[7]
In finding that Dufour is not mentally retarded based on his failure to establish deficits in adaptive behavior, the trial court relies significantly on the adaptive skills Dufour does possess, rather than his deficits. For example, the trial court stated in its findings on adaptive behavior:

*258 Mr. Dufour does not read or write much, if at all. He does not play chess in the Department of Corrections. He does not have good hygiene habits. In the past, he drove a car and possessed a driver's license. He participated in teaching a small engine repair class while in prison in the 1970's. He could be good with children. He was capable of interacting in social situations, and could be friendly and engaging. He appeared to understand discussions with his trial counsel.
This approach to assessing adaptive behavior is at odds not only with the statutory definition itself but also with the current consensus within the scientific community as to the proper method for assessing adaptive behavior in the criminal justice context. Specifically, the AAIDD and the DSM-IV stress that the focal point of adaptive behavior should be on the individual's limitations rather than demonstrated adaptive skills. An important reason for this policy is that "[t]he skills possessed by individuals with mental retardation vary considerably, and the fact that an individual possesses one or more that might be thought by some laypersons as inconsistent with the diagnosis (such as holding a menial job, or using public transportation) cannot be taken as disqualifying." James W. Ellis, Mental Retardation and the Death Penalty: A Guide to State Legislative Issues, 27 Mental & Physical Disability L. Rep. 11, 21 n.29 (2003).
The AAIDD, in its amicus brief to this Court, explains that the significant limitations in adaptive behavior must be based on objective measurements and not weighed against adaptive strengths. The purpose of the adaptive functioning prong is to ascertain whether the measured intellectual score reflects a real-world disability, as opposed to a testing anomaly. Thus for this prong, the diagnostician's focus must remain on the presence of confirming deficits. Accordingly, the AAIDD has specifically noted that "assessments must ... assume that limitations in individuals often coexist with strengths, and that a person's level of life functioning will improve if appropriate personalized supports are provided over a sustained period." Am. Ass'n on Intellectual & Developmental Disabilities, Definition of Intellectual Disability, http://www.aaidd.org/content_100.cfm?nav ID=21 (last visited Jan. 14, 2011).[8] Further, as the AAIDD correctly explains, much of the clinical definition of adaptive behavior is much less relevant in prisons, and in fact, a person with mental retardation is likely to appear to have stronger adaptive behavior in a structured environment such as a prison than in society. The amicus brief of the AAIDD further points out that "[s]tereotypes and lay assumptions about people with mental retardation can cloud or distort individual assessment."
The failure to take an objective approach to deficits in adaptive behavior can result in the perpetuation of misunderstanding mental retardation. In State v. White, 118 Ohio St.3d 12, 885 N.E.2d 905 (2008), the Supreme Court of Ohio reversed the trial court's finding that White failed to prove significant deficiencies in adaptive behavior. In its opinion, the court focused on concerns similar to those *259 advanced by the AAIDD as to improperly focusing on an individual's demonstrated adaptive skills and placing too much importance on lay testimony regarding White's demonstrated adaptive skills:

The mentally retarded are not necessarily devoid of all adaptive skills. Indeed, "they may look relatively normal in some areas and have certain significant limitations in other areas." Mildly retarded persons can play sports, write, hold jobs, and drive. Dr. Hammer testified that in determining whether a person is mentally retarded, one must focus on those adaptive skills the person lacks, not on those he possesses.
The trial court's analysis appears to disregard this testimony. For example, the trial court's opinion mentions twice that White was a licensed driver. However, Dr. Hammer testified that a mildly retarded individual can qualify for a driver's license and that licensed-driver status is not a good criterion for distinguishing between people who are and are not retarded.
....
The trial court's analysis was also misdirected in stressing that White's family and peers did not perceive White to be lacking in adaptive behavior skills. Both experts testified that laymen cannot easily recognize mild mental retardation....
... In light of [Dr. Hammer's] unrebutted testimony, the impressions of White's peers ... lend no support to the findings of the trial court.
White, 885 N.E.2d at 914-15 (emphasis added). While the Ohio Supreme Court recognized that a trial court is the trier of fact, the court concluded that the trial court abused its discretion in making this determination by disregarding "credible and uncontradicted expert testimony in favor of ... the court's own expectations of how a mentally retarded person would behave." Id. at 915.
In this case, the trial court likewise erred in failing to properly evaluate Dr. Keyes' objective testimony in regard to deficits in adaptive functioning. Although the trial court stated that Dr. Keyes provided a "great deal of substantive information about mental retardation" and found that his opinion was entitled to moderate weight and was "very useful in arriving at a legal conclusion," these findings are in seeming contradiction to the trial court's ultimate findings that the defendant failed to produce sufficient evidence that his adaptive behavior is impaired to the degree necessary to support a finding of mental retardation, either under the clear and convincing standard or under the preponderance of the evidence standard. The trial court does not explain whether it found the State's expert witnesses to be more credible on the topic of adaptive behavior. Further, the trial court does not appear to provide an underlying reason for discounting any of Dufour's lay and expert witness testimony regarding adaptive behavior.
In this regard, there was significant evidence supporting a claim of deficits in adaptive functioning. Dr. Keyes conducted adaptive functioning testing on Dufour and as part of the assessment, interviewed Dufour, two inmates on death row whose cells were adjacent to Dufour's, and two individuals who knew Dufour prior to the age of 18. On the tests administered by Dr. Keyes, Dufour ultimately scored more than two standard deviations below the mean on the General Adaptive Composite, which is consistent with mental retardation. Further, various witnesses established that Dufour never lived alone, always relied on others for help and support, was not in charge of paying bills, never held a job for more than a few months, and *260 never had a checking account, and that the jobs he did hold were menial, he was easily led around and influenced by others, and he was always more comfortable playing with children. Even State witness Dr. McClaren agreed that Dufour's history of academic failure and menial jobs, along with his history of poor relationships, could be consistent with a diagnosis of mental retardation. The evidence demonstrates that Dufour has significant adaptive functioning limitations in communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.
The testimony also established that Dufour demonstrated "abysmal" academic performance in school. He failed kindergarten and had to repeat second grade. He never passed second grade, but instead was "placed" for the remainder of elementary school. Dufour was also in the lowest level of classes, i.e., basic. Dufour's basic English teacher in seventh grade, Joyce Jones, described Dufour's mental abilities as below average and thought he was "very possibly" mentally retarded. She also described him as immature, "like a little kid." She did not remember Dufour having any friends. Dufour did not graduate from vocational technical school. Further, evidence demonstrated that Dufour has difficulty with spelling, punctuation, and grammar and reads at a basic level.
While there is evidence that Dufour learned to perform small-engine repair while incarcerated, even the State's expert witness Dr. Merin acknowledged that people with mental retardation can also be taught carpentry skills, how to fix complex items, work in a stockroom, and drive an automobile. While I acknowledge evidence that the defendant obtained his GED is relevant to the court's inquiry, this fact alone does not eliminate a finding that Dufour was mentally retarded, especially in light of his overall academic performance and his uncontroverted significantly subaverage IQ of under 70. Additionally, the majority opinion discusses the significance and difficulty as to the specific version of the GED that Dufour was given based on non-record evidence, which neither the State nor its witnesses presented or discussed. Attributing significance to the GED that was not specifically argued, based on non-record evidence, deprives Dufour of the opportunity to explain or counter these conclusions.
Finally, and importantly, the trial court committed a significant error in its analysis of this prong by rejecting the deficits in adaptive behavior based on an "alternative explanation" for the deficits. Specifically, the trial court found any deficits in Dufour's adaptive behavior were not caused by mental retardation, but were the consequence of intense drug use and his "deplorable home environment." The majority perpetuates the error by accepting these findings. Contrary to the trial court and the majority, nothing within the plain language of section 921.137 or rule 3.203 requires proof as to the causation of deficits in adaptive functioningonly that the defendant has such deficits. In determining whether a defendant has shown mental retardation, this Court is confined to the statutory definition of "mental retardation" and is not at liberty to add additional requirements or exceptions to the definition.
Nothing within the statutory requirements or within the clinical definition of mental retardation supports the theory that determining the cause of the deficits is a part of the inquiry in determining mental retardation. Moreover, the trial court does not rely on any expert opinion to support its conclusion that alternative explanations can disqualify a person who otherwise would be considered mentally *261 retarded based on meeting each prong in the statutory definition of the term.
The statute and rule define mental retardation as a condition that meets the above three prongs, without specifying the origin of the disability.[8] In this case, retardation have no identifiable origin. See Am. Ass'n on Intellectual & Dr. Keyes, a very qualified expert in mental retardation, explained that Dufour has numerous risk factors for mental retardation: traumatic brain injury before the age of 18, malnutrition, an impaired childcare giver (his alcoholic abusive father), lack of adequate stimulation, domestic violence, and child abuse.
Specifically, there was evidence that after he was born, Dufour suffered from traumatic brain damage from an unidentified source, lacked adequate stimulation, was abused as a child, and suffered multiple head injuries, both before and after the age of 18. Further, Dufour started using alcohol and drugs at a very young age, including inhaling toluene or glue at the age of ten. In other words, his "deplorable home environment" and intense drug use may have been contributing factors to his mental retardation, but those risk factors are not a basis to reject a finding of mental retardation.
The Eighth Amendment's protection against execution afforded to mentally retarded individuals does not depend on the cause of the mental retardation. Further, a trial court's approach relating to alternative explanations has the potential to place a significant and unnecessary roadblock in front of a defendant who is attempting to establish mental retardation. A capital defendant who attempts to establish that he is mentally retarded may have multiple risk factors for mental retardation in his or her background such as abusive childhood (with physical and sexual abuse), lack of childhood stimulation (including abandonment and neglect by parents), and substance abuse. The linchpin for the deficits in adaptive behavior and significantly subaverage IQ is that both of these prongs must have been manifested before the age of 18. The cause of the deficits in adaptive behavior is not part of the inquiry as long as the defendant can prove he meets all three prongs.
In conclusion, I believe that this Court would be well-served in remanding this case for a reevaluation of the evidence presented so that we can be assured that findings regarding mental retardation are based on solid, scientifically acceptable explanations. While it may very well be that the totality of the circumstances supports a finding that Dufour is not mentally retarded, this review should occur after the trial court reevaluates the IQ and adaptive behavior prongs. Therefore, for the reasons expressed above, I would remand for a reevaluation of the evidence by the trial court.
QUINCE and PERRY, JJ., concur.
NOTES
[1] In sentencing Dufour to death, the trial court found no mitigating circumstances and four aggravating circumstances: (1) Dufour was previously convicted of another capital felony; (2) the murder was committed while Dufour was engaged in the commission of an armed robbery; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See Dufour v. State, 905 So.2d 42, 49 (Fla.2005) (Dufour III).
[2] Dufour advanced that (1) the trial court erred in denying his motion to suppress evidence seized during a search of his residence; (2) the testimony of Henry Miller should have been suppressed; (3) the trial court erred in denying several motions for mistrial; (4) the trial court abused its discretion in limiting the cross-examination of state witness Robert Taylor; (5) the trial court erred in allowing a detective to read into evidence portions of a statement made by Robert Taylor in 1982; (6) a mistrial was required after certain comments in the prosecutor's closing argument impermissibly directed the attention of the jurors to Dufour's decision to not testify; (7) the trial court committed reversible error in finding Dufour's absence during a pretrial motions hearing voluntary and conducting the hearing in his absence; (8) the trial court erred in denying his motions for a continuance; (9) the trial court erred in declining to impose sanctions for an alleged violation by the prosecution of the provisions of Florida Rule of Criminal Procedure 3.220(b)(3); (10) the trial court erred in forcing Dufour to wear leg shackles during the trial; (11) the trial court erred in denying Dufour's motion for mistrial; (12) the trial court erred in denying Dufour's proposed special instructions on the jury's sentencing recommendation; (13) the trial court erred during the penalty phase by admitting into evidence extensive details of the Mississippi murders committed by Dufour; (14) the trial court erred in denying Dufour's motion to strike death as a possible penalty because the charging indictment had failed to allege the aggravating factors possibly subjecting him to the death penalty; (15) the trial court erred in finding that the avoid arrest aggravating factor was established; and (16) the trial court erred in finding that the cold, calculated, and premeditated aggravating circumstance was established. See Dufour I, 495 So.2d at 157-64.
[3] Dufour contended that (1) his counsel rendered ineffective assistance by failing to investigate and present a defense of voluntary intoxication and in failing to strike jurors during the guilt phase; (2) his penalty phase counsel rendered ineffective assistance; (3) he received an inadequate mental health evaluation; (4) he was prejudiced by the cumulative impact of improper evidence; (5) his trial counsel was ineffective in failing to object when the sentencing jury was misled by comments, questions, and instructions that inaccurately diluted the jury's sense of responsibility for their role in the sentencing process; (6) the State committed fundamental error by destroying exculpatory physical evidence; (7) Florida's death penalty statute was unconstitutional; (8) section 921.141(5), Florida Statutes (1981), was facially vague and overbroad; (9) the rule prohibiting Dufour's lawyers from interviewing jurors was unconstitutional; and (10) the combination of procedural and substantive errors cumulatively deprived him of a fair trial. See id. at 50 n. 1.
[4] Dufour asserted that (1) his appellate counsel rendered ineffective assistance during his direct appeal; (2) the cold, calculated, and premeditated jury instruction was unconstitutionally vague and overbroad; (3) his death sentence was unconstitutional because the jury did not render a verdict on each element of the capital offense; and (4) the combination of procedural and substantive errors cumulatively deprived Dufour of a fair trial. See id. at 50 n. 2.
[5] Both the rule and the statute have been amended since 2005, but those amendments did not alter the relevant substance of the prior rule and statute. See In re Amendments to the Florida Rules of Criminal Procedure, 26 So.3d 534, 536 (Fla.2009) (correcting citation and references to time periods); ch.2006-195, § 23, Laws of Fla. (effective June 12, 2006) (amending title and substituting "Agency for Persons with Disabilities" for "Department of Children and Family Services").
[6] Contrary to the majority's characterization, I do not dispute that the State presented evidence that Dufour obtained his GED or that the experts used this information in evaluating whether Dufour is mentally retarded. However, the majority relies on non-record sources in discussing the rigors and specific requirements of the version of the GED that Dufour took in 1978information which was not presented by Dr. Merin or Dr. McClaren. I take issue only with the non-record evidence that is utilized in the majority opinion. See majority op. at 28-29.
[7] Atkins adopted this framework from the AAIDD's 1992 definition of mental retardation, which was substantially similar to the definition of mental retardation set forth by the American Psychiatric Association (APA) in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (2000) (DSM-IV): (1) significantly subaverage general intellectual functioning that is accompanied by (2) significant limitations in adaptive functioning in at least two skill areas (communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety); and (3) the onset must occur before age 18. Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). However, unlike the AAIDD definition, the DSM-IV definition still distinguished between degrees of mental retardation (i.e., mild, moderate, severe, and profound). See Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242; J. Gregory Olley & Ann W. Cox, Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior SystemII, in Adaptive Behavior Assessment System-II, Clinical Use & Interpretation 383 (Thomas Oakland & Patti L. Harrison ed., 2008).
[8] The AAIDD has explicitly stated that "[m]ental retardation and intellectual disability are two names for the same thing. But intellectual disability is gaining currency as the preferred term." Am. Ass'n on Intellectual & Developmental Disabilities, FAQ on Intellectual Disability, http://www.aaidd.org/ content_104.-cfm (last visited Jan. 14, 2011). However, the term "mental retardation" is the term that is generally contained in current federal and state laws.
[8] In fact, approximately forty to fifty percent of the causes of mental Developmental Disabilities, FAQ on Intellectual Disability, http:// www.aaidd.org/content_104.cfm (last visited Jan. 14, 2011).