# Supreme Court of Florida

_____

No. SC13-1213
_____

**TAVARES J. WRIGHT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 27, 2018

PER CURIAM.

This case is before the Court on remand from the decision of the United States Supreme Court in *Wright v. Florida* (*Wright v. Florida*), 138 S. Ct. 360 (2017), which granted certiorari and vacated our decision in *Wright v. State* (*Wright*), 213 So. 3d 881 (Fla. 2017). In *Wright*, we affirmed the denial of Tavares Wright's intellectual disability (ID) claim. 213 So. 3d at 912. After we released *Wright*, the Supreme Court issued *Moore v. Texas*, 137 S. Ct. 1039 (2017). Because that decision is potentially relevant to this case, the Supreme Court vacated and remanded to allow us to reconsider *Wright*. *Wright v. Florida*, 138 S. Ct. 360. Therefore, the issue is whether *Moore* impacted the denial of Wright's ID

claim.  For the reasons that follow, we hold that *Moore* does not require a different result in this case; therefore, we reaffirm the denial of Wright's ID claim.

## FACTUAL AND PROCEDURAL BACKGROUND

This Court detailed the underlying crimes in Wright's direct appeal. *Wright v. State* (*Wright I*), 19 So. 3d 277, 283-91 (Fla. 2009) (affirming convictions and sentences).  For the purposes of this proceeding, it is only germane that Wright was convicted of, and sentenced for, two counts of first-degree murder, two counts of armed kidnapping, two counts of robbery with a firearm, and one count of carjacking with a firearm.  *Id.* at 283.  Also, prior to sentencing, the trial court held a special hearing to determine if Wright had ID.  *Id.* at 289-90.  In 2010, Wright filed a postconviction motion, which the postconviction court denied.  *Wright*, 213 So. 3d at 894.  While the appeal of that decision was pending before this Court, the Supreme Court issued its opinion in *Hall v. Florida*, 134 S. Ct. 1986 (2014). *Wright*, 213 So. 3d at 894.  Resultantly, this Court relinquished jurisdiction and remanded to the postconviction court, allowing Wright to file a renewed motion for determination of ID.  *Id.*

The postconviction court granted an evidentiary hearing on Wright's renewed motion.  *Id.*  The evidentiary hearing took place on January 5-6, 2015, and February 11, 2015.  During that hearing, Wright presented six witnesses, and the

- 2 -

State presented thirteen witnesses. *Id.* at 894.[1]  On March 26, 2015, the postconviction court denied Wright's renewed motion for determination of ID as a bar to execution. *Id.*  Along with his other rejected postconviction claims, Wright appealed that order here, and we initially affirmed the decision in November 2016. Upon rehearing, we issued a revised opinion with limited changes on March 16, 2017.

Nearly two weeks later, on March 28, 2017, the Supreme Court issued its opinion in *Moore*.  As a result of Wright's certiorari petition, the Supreme Court vacated *Wright* and remanded for reconsideration in light of *Moore*.  The remand order follows in full:

> The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted.  The judgment is vacated, and the case is remanded to the Supreme Court of Florida for further consideration in light of *Moore v. Texas*, 581 U.S. ___ (2017).

*Wright v. Florida*, 138 S. Ct. 360.

This review follows.

---

1.  In *Wright*, we recounted the evidence presented at the renewed ID hearing at length.  213 So. 3d at 893-902.  To avoid superfluity, the relevant evidentiary facts are included where appropriate below.

## ANALYSIS

We resolve this case in three parts below: (1) the nature of the remand order; (2) the intelligence prong of the ID test; and (3) the adaptive functioning prong of the ID test.

However, as a preliminary matter, it is necessary to clarify what *Moore* did not change—our standard of review. As noted in *Glover v. State*, 226 So. 3d 795 (Fla. 2017), neither *Hall* nor *Moore* "alter[ed] the standard for reviewing the trial court's determination as to whether the defendant is intellectually disabled." *Id.* at 809.

> In reviewing the circuit court's determination that [the defendant] is not intellectually disabled, "this Court examines the record for whether competent, substantial evidence supports the determination of the trial court." *State v. Herring*, 76 So. 3d 891, 895 (Fla. 2011). [This Court] "[does] not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." *Brown v. State*, 959 So. 2d 146, 149 (Fla. 2007). However, [this Court] appl[ies] a de novo standard of review to any questions of law. *Herring*, 76 So. 3d at 895.

*Glover*, 226 So. 3d at 809 (alterations in original) (quoting *Oats v. State*, 181 So. 3d 457, 459 (Fla. 2015)).

### The Remand Order

First, we must dispel Wright's impression that the Supreme Court's vacation and remand indicates that it either reversed on the merits or intends for us to do so. The remand was in the form of a Supreme Court summary reconsideration order,

- 4 -

which is colloquially known as a "GVR" (granted, vacated, and remanded). A GVR is a "mode of summary disposition, *though not necessarily on the merits*, [by] an order that grants certiorari, vacates the judgment below, and remands the case to the lower court for reconsideration in light of an intervening Supreme Court ruling." Stephen M. Shapiro et al., *Supreme Court Practice* 346 (10th ed. 2013) (emphasis added) (collecting cases as examples of GVRs with nearly identical language as the GVR here, including *Siegelman v. United States*, 130 S. Ct. 3542 (2010)); *see also* Aaron-Andrew P. Bruhl, *The Supreme Court's Controversial GVRs—And an Alternative*, 107 Mich. L. Rev. 711, 712 (2009). Although we have not explicitly addressed this subject, other courts have resoundingly determined that a GVR is neither a merits determination nor precedential case law:

> It is important to remember, however, that a GVR order is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it. *See Pratt v. Philbrook*, 109 F.3d 18, 19-20 (1st Cir. 1997). The GVR order itself does not constitute a final determination on the merits; it does not even carry precedential weight. *See Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001); *Henry v. City of Rock Hill*, 376 U.S. 776, 777 (1964); *see also Lawrence*[ *v. Chater*, 516 U.S. 163, 178 (1996)] (Scalia, J., dissenting) (suggesting that the GVR ought to be termed "no fault V & R" because it represents a "vacation of a judgment and remand *without* any determination of error in the judgment below"). Consequently, we do not treat the Court's GVR order as a thinly-veiled direction to alter our course . . . .

*Gonzalez v. Justices of Mun. Court of Bos.*, 420 F.3d 5, 7 (1st Cir. 2005); *see, e.g.*, *Kenemore v. Roy*, 690 F.3d 639, 642 (5th Cir. 2012) ("A GVR does not bind the lower court to which the case is remanded; that court is free to determine whether its original decision is still correct in light of the changed circumstances or whether a different result is more appropriate."); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006) (same); *United States v. Norman*, 427 F.3d 537, 538 n.1 (8th Cir. 2005) (same); *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 796 n.5 (8th Cir. 2005) (same); *Peterson v. BASF Corp.*, 711 N.W.2d 470, 474 n.5 (Minn. 2006) (same).

Upon receiving nearly identical *Moore* GVR orders, some courts have affirmed their original decisions as unchanged by *Moore*, *see Carroll v. State*, No. CR-12-0599, 2017 WL 6398236, at *2, *6 (Ala. Crim. App. Dec. 15, 2017), while others have remanded further for trial courts to determine *Moore*'s effect on each particular case, *see Long v. Davis*, 706 Fed. App'x 181 (5th Cir. 2017); *Henderson v. Davis*, 868 F.3d 314 (5th Cir. 2017).  Wright, however, does not present or direct us to any case that has held a GVR, or a *Moore* GVR, requires a different result per se.  Thus, consistent with other courts' consideration of these orders, we will not guess at the implied intentions of the Supreme Court's GVR order.  Rather—following the plain language of the order—we simply reconsider this case

in light of *Moore* to determine if a different outcome is warranted. *Wright v. Florida*, 138 S. Ct. 360.

## Intelligence Prong

Second, Wright contends that we erred by affirming the postconviction court's finding that he failed to satisfy his burden of proof on the intellectual functioning prong of the ID test. However, *Moore* does not substantially change the law with regard to consideration of intelligence or IQ for the purposes of an ID determination; thus, Wright's claim fails again.

It is unconstitutional to impose a death sentence upon any defendant with ID. *Moore*, 137 S. Ct. at 1048; *Atkins v. Virginia*, 536 U.S. 304, 321 (2002); *see also* § 921.137(2), Fla. Stat. (2017). In Florida, section 921.137, Florida Statutes, defines ID with a three-prong test: (1) "significantly subaverage general intellectual functioning [(2)] existing concurrently with deficits in adaptive behavior and [(3)] manifested during the period from conception to age 18." § 921.137(1); *see Hall*, 134 S. Ct. at 1994.[2] To demonstrate ID, a defendant must make this showing by clear and convincing evidence. § 921.137(4).

---

2. This definition parallels the current medical consensus surrounding the definition of ID. *See, e.g.*, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013) (hereinafter DSM-5); American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 5 (11th ed. 2010) (hereinafter AAIDD-11). On the third prong, the postconviction court found that

With regard to the first prong, the statute defines the phrase "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." § 921.137(1). Currently, the mean IQ score of the general population is approximately 100; and each standard deviation represents about 15 points. *Hall*, 134 S. Ct. at 1994; DSM-5, at 37. Accordingly, the medical approximation of significant subaverage intellectual functioning is an IQ score of 70, plus or minus. *Hall*, 134 S. Ct. at 1994; DSM-5, at 37. There is a standard error of measurement (SEM) that affects each IQ score, which results in a range approximately 5 points above and below the raw IQ test score. *Hall*, 134 S. Ct. at 1995; DSM-5, at 37. Rather than interpreting IQ scores as a single, fixed number, medical professionals read IQ scores as a range to account for SEM. *Hall*, 134 S. Ct. at 1995; AAIDD-11, at 36. For this reason, the Supreme Court rejected the use of a strict 70-point ID cutoff in *Hall*, noting that courts must account for SEM because "an individual with an IQ test score 'between 70 and 75 or lower,' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." 134 S. Ct. at 2000 (citation omitted) (quoting *Atkins*, 536 U.S. at 309

---

Wright's intellectual condition, whatever it may be classified as, preceded his eighteenth birthday. This finding is undisputed.

n.5). This means that an "IQ test result of 75 [i]s squarely in the range of potential intellectual disability." *Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015).

As it pertains to the intelligence prong of the ID test, *Moore* generally embodies a simple affirmation of the principles announced in *Hall*. Following *Hall*, the Supreme Court again stated that when a defendant establishes an IQ score range—adjusted for the SEM—"at or below 70," then a court must "move on to consider [the defendant's] adaptive functioning." *Moore*, 137 S. Ct. at 1049. The high court explained further:

> In requiring the CCA [(the Texas Court of Criminal Appeals)] to move on to consider Moore's adaptive functioning in light of his IQ evidence, we do not suggest that "the Eighth Amendment turns on the slightest numerical difference in IQ score," *post*, at 1061. *Hall* invalidated Florida's strict IQ cutoff because the cutoff took "an IQ score as the final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence." 572 U.S., at ——, 134 S. Ct., at 1995. Here, by contrast, we do not end the intellectual disability inquiry, one way or the other, based on Moore's IQ score. Rather, in line with *Hall*, we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits.

*Moore*, 137 S. Ct. at 1050.

Both this Court and the postconviction court followed *Moore*'s subsequent instructions. In this case, both courts acknowledged that Wright's IQ score range—adjusted for the SEM—fell into the borderline ID range and the lowest end of the range dipped 1 point beneath 70; therefore, Wright was allowed to offer

evidence of adaptive functioning. *Wright*, 213 So. 3d at 897-98. Rather than disregarding the lower range of Wright's IQ scores, as the CCA did in *Moore*, both Florida courts properly considered all valid, SEM-adjusted scores and moved on to examine Wright's adaptive functioning. *Wright*, 213 So. 3d at 898; *see Moore*, 137 S. Ct. at 1049. Neither *Hall* nor *Moore* requires a significantly subaverage intelligence finding when one of many IQ scores falls into the ID range. Instead, those cases instruct courts to be "informed by the medical community's diagnostic framework," not employ a strict cutoff, and consider other evidence of ID when clinical experts would do the same. *Hall*, 134 S. Ct. at 2000; *see Moore*, 137 S. Ct. at 1048-49. This Court and the postconviction court below followed that directive and properly considered all three prongs of the ID test. *Wright*, 213 So. 3d at 895-902; *see Glover*, 226 So. 3d at 810-11; *Oats*, 181 So. 3d at 467-68.

Based on the competing medical testimony of Dr. Kasper and Dr. Gamache—along with numerous IQ test scores above 70 after SEM adjustments—there was competent, substantial evidence for the postconviction court to conclude that Wright failed to prove significant subaverage intellectual functioning by clear and convincing evidence. For instance, on his July 15, 2005, IQ test, Wright scored an 82 with a range of 79-86, which is well above the approximation for ID. The evidence presented supported the postconviction court's finding that Wright failed to satisfy his burden of proof on the significantly subaverage intelligence

prong. This Court correctly held that finding to be supported by competent, substantial evidence. *Wright*, 213 So. 3d at 898. Regardless, both decisions went further to consider adaptive functioning as described below.[3]

Accordingly, we need not alter our affirmance of the postconviction court's finding on the intelligence prong in light of *Moore*.

---

3. According to Justice Lawson's opinion, the fact that Wright failed to establish this first prong ends our inquiry. Concurring in result op. at 27-28 (Lawson, J.) (citing *Salazar v. State*, 188 So. 3d 799, 812 (Fla. 2016)). Whether the failure on one prong of the ID test is dispositive as a general matter may be a question in a different case. *Compare Salazar*, 188 So. 3d at 812 (stating that the failure on one prong of the ID test is dispositive), *with Oats*, 181 So. 3d at 467-68 (holding that the failure on one prong of the ID test is not necessarily dispositive). Yet that is not the issue in this case. Here—on remand from the Supreme Court's GVR order—we are simply reconsidering Wright's claim to determine if *Moore* changed the outcome. As we explained above, Wright's SEM-adjusted IQ range fell 1 point below 70. *Supra* pp. 9-10. Therefore, the postconviction court properly allowed him to introduce evidence of his adaptive functioning, which we addressed on appeal. *Wright*, 213 So. 3d at 897-98; *see also Moore*, 137 S. Ct. at 1049 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning."); *Hall*, 134 S. Ct. at 2001. The Supreme Court vacated *Wright* because *Moore* may have impacted the outcome of Wright's ID claim; thus we must determine if *Moore* altered our decision by reviewing its effect on our earlier analysis. Therefore, any discussion of *Salazar* or its potential conflict with *Oats* is unnecessary here, particularly because Wright clearly failed to establish either prong at issue. *See In re Holder*, 945 So. 2d 1130, 1133 (Fla. 2006) ("Of course, we have long subscribed to a principle of judicial restraint by which we avoid considering a constitutional question when the case can be decided on nonconstitutional grounds.").

**Adaptive Functioning Prong**

Lastly, Wright contends that we erred in affirming the postconviction court's finding that he failed to prove deficits in his adaptive functioning. Although *Moore* addressed the adaptive functioning prong, the decision does not change the outcome of Wright's claim here.

This issue relates to the second prong of the ID test: concurrent "deficits in adaptive behavior." § 921.137(1). The statute defines "adaptive behavior" as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." *Id.* In Florida, the first prong (subaverage intelligence) must exist "concurrently" with the second prong, which this Court has interpreted to mean that the two must exist "at the same time" and "there must be current adaptive deficits." *Dufour v. State*, 69 So. 3d 235, 248 (Fla. 2011); *see Jones v. State*, 231 So. 3d 374, 376 (Fla. 2017); *Jones v. State*, 966 So. 2d 319, 326 (Fla. 2007).[4] The AAIDD-11 and DSM-5 definitions are mostly similar to the statutory

_____

4. Wright challenges *Dufour*'s concurrent adaptive deficit requirement. Neither *Hall* nor *Moore* addressed the issue; yet both the AAIDD-11 and DSM-5 state that current adaptive deficits are the focus of this inquiry. AAIDD-11, at 54 ("Currently, adaptive behavior is defined and measured on the basis of the individual's typical present functioning."); DSM-5, at 38 ("[The second prong] is met when at least one domain of adaptive functioning . . . is sufficiently impaired that ongoing support is needed."). Moreover, because intelligence and functioning deficits must present themselves during the developmental stage (prong three), it seems necessary that they exist at the same time (i.e., before a defendant turns

- 12 -

definition.  *Compare* § 921.137(1), *with* DSM-5, at 37, *and* AAIDD-11, at 6, 43.

Comparable to IQ scores, the AAIDD-11 recommends that adaptive deficits be

established by standardized tests when an individual scores approximately two

standard deviations below the population mean, with the results accounting for

SEM.  AAIDD-11, at 47; *see also* DSM-5, at 37.

The DSM-5 divides adaptive functioning into three broad categories or

"domains": conceptual, social, and practical.  DSM-5, at 37; *see also* AAIDD-11,

at 43.  The conceptual domain "involves competence in memory, language,

reading, writing, math reasoning, acquisition of practical knowledge, problem

solving, and judgment in novel situations."  DSM-5, at 37.  The social domain

"involves awareness of others' thoughts, feelings, and experiences; empathy;

interpersonal communication skills; friendship abilities; and social judgment."  *Id.*

The practical domain "involves learning and self-management across life settings,

including personal care, job responsibilities, money management, recreation, self-

management of behavior, and school and work task organization."  *Id.*  According

to the DSM-5, adaptive deficits exist when at least one domain "is sufficiently

impaired that ongoing support is needed in order for the person to perform

---

eighteen).  *See* DSM-5, at 38; AAIDD-11, at 11-12.  Thus, with regard to his
*Dufour* challenge, Wright's claim fails.

adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38; *see* AAIDD-11, at 43.[5]

Before delving into *Moore* and its application in this case, it is important to note that only one domain is at issue here: the conceptual. Both experts testified at the renewed ID determination hearing—including Wright's own expert—that Wright has no deficits in the social and practical domains that rise to the level of an ID determination. *Wright*, 213 So. 3d at 900.

In *Moore*, the Supreme Court reversed because the CCA "deviated from prevailing clinical standards and from the older clinical standards the court claimed to apply" when it found no adaptive deficits. 137 S. Ct. at 1050. Most of *Moore* focused on adaptive functioning. Specifically, the Supreme Court took issue with the CCA's analysis of adaptive functioning for three reasons: (1) "the CCA overemphasized Moore's perceived adaptive strengths"; (2) the CCA "concluded that Moore's record of academic failure, along with the childhood abuse and

---

5. The DSM-5 differs from earlier editions in that adaptive deficits are now organized into three broad domains as opposed to numerous subcategories. Prior opinions held that defendants must show deficits in at least two of the previous smaller subcategories. *E.g.*, *Dufour*, 69 So. 3d at 511; *Hodges v. State*, 55 So. 3d 515, 534 (Fla. 2010). However, the new broad domains subsumed the previous subcategories; thus, currently, deficits in some of the subcategories are necessary to find a deficit in one of the broader domains. Yet, for all intents and purposes, the analysis is similar because deficits in the subcategories are still required to find deficits in the broader domains.

suffering he endured, detracted from a determination that his intellectual and adaptive deficits were related"; and (3) the "CCA's attachment to the seven [*Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004)] evidentiary factors further impeded its assessment of Moore's adaptive functioning." *Moore*, 137 S. Ct. at 1050-51.

The CCA had reversed a state habeas court that applied current medical standards—the DSM-5 and AAIDD-11—and found the defendant to have ID. *Id.* at 1045-46. The habeas court applied medical standards to the substantial evidence of the defendant's adaptive deficits before concluding that there were deficits in all three domains. *Id.* In fact, both the state and defense experts agreed that the defendant's adaptive functioning scores were more than two standard deviations below the mean. *Id.* at 1047. Despite this, the CCA reversed, making its own findings and rejecting the lower court's findings, in part, for the failure to rely on *Briseno*. *Id.* at 1046.[6] *Briseno* adopted an ID definition from the 1992 edition of the AAIDD-11 (two editions prior to the current edition) which included a relatedness requirement. *Id.* at 1046. The relatedness requirement, that adaptive deficits be "related" to intellectual functioning deficits, has been removed from the

---

6. In Texas, the CCA is " 'the ultimate factfinder' in habeas corpus proceedings" rather than the court of first instance. *Moore*, 137 S. Ct. at 1044 n.2 (quoting *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008)).

AAIDD-11. *Id.* Still, the CCA held that the lower court should have applied the *Briseno* factors to determine whether the defendant demonstrated relatedness. *Id.* Those factors had no medical or legal authority to support them, and they reflected a misinformed layperson's understanding of ID; for instance, the first *Briseno* factor follows:

> Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

*Id.* at 1046 n.6. Furthermore, in making its findings, the CCA emphasized the defendant's adaptive strengths and concluded that the lower court "erred by concentrating on Moore's adaptive weaknesses." *Id.* at 1047. Contrary to the CCA's conclusion, the DSM-5 and AAIDD-11 expressly instruct clinicians to focus on adaptive deficits. DSM-5, at 33, 38; AAIDD-11, at 47. In fact, the AAIDD-11 states that "significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." AAIDD-11, at 47; *see Moore*, 137 S. Ct. at 1050. According to the Supreme Court, the CCA also erred by concluding that the defendant's academic failures and childhood abuse detracted from an adaptive deficit finding; this was an error because medical experts would consider those "risk factors" for ID rather than a basis to counter an ID determination. *Moore*, 137 S. Ct. at 1051.

On two occasions this Court briefly addressed the impact of *Moore* on Florida's ID analysis. *Glover*, 226 So. 3d at 811 n.13; *Rodriguez v. State*, 219 So. 3d 751, 756 n.6 (Fla. 2017). *Glover* concisely stated:

> The determination that Glover is not intellectually disabled was made under "the generally accepted, uncontroversial intellectual-disability diagnostic definition," which is the same three-part standard that this Court follows. *See Rodriguez*, 219 So. 3d [at 756 n.6] (quoting *Moore*[, 137 S. Ct. at 1045]). This distinguishes the trial court's determination in Glover's case from a Texas court's determination in a recent case, which the Supreme Court invalidated, in part, because the Texas court relied upon superseded medical standards to conclude that the defendant was not intellectually disabled. *See generally Moore*, 137 S. Ct. 1039.

*Glover*, 226 So. 3d at 811 n.13. As explained above and noted in *Glover*, neither section 921.137 nor this Court's interpretation of the statute has been superseded by medical standards. *Supra* pp. 7 note 3, 12-13; *see generally* DSM-5, at 37; AAIDD-11, at 5. Unlike Texas, Florida does not maintain a relatedness requirement between the first two prongs. *See* § 921.137; *Moore*, 137 S. Ct. at 1046.[7] Further, this Court has never relied on or suggested in any way reliance on *Briseno* for the point of law that the Supreme Court rejected in *Moore*. As a general matter, therefore, *Moore* does not call Florida's adaptive functioning

---

7. To the extent that this Court has discussed relatedness, it has been in the context of experts relying on the DSM-5—which retains the relatedness requirement—rather than imposing an arbitrary list of evidentiary factors like *Briseno*. *See Glover*, 226 So. 3d at 810; *Hampton v. State*, 219 So. 3d 760, 779 (Fla. 2017).

analysis into question. *See Glover*, 226 So. 3d at 811 n.13; *Rodriguez*, 219 So. 3d at 756 n.6. However, it is still necessary to determine if *Moore* affected the validity of Wright's ID determination.

The record in this case demonstrates that the postconviction court and the medical experts below relied on current medical standards. Even the State's expert, Dr. Gamache, used current medical expertise to inform his testimony. Moreover, the postconviction court demonstrated a willingness to engage with the clinical manuals and understand how they fit together with the case law. Unlike *Moore*, this Court did not reject the postconviction court's reliance on current medical standards. *Compare Moore*, 137 S. Ct. at 1045-47, *with Wright*, 213 So. 3d at 899-902. Instead, we accepted the findings and affirmed the postconviction court's determination that Wright does not qualify as an ID defendant who cannot be executed. *Wright*, 213 So. 3d at 902. In doing so, current medical understanding served as the basis for the rejection of Wright's claim, which differentiates this case from *Moore* where the CCA relied on outdated medical standards and lay perceptions of ID. *See Moore*, 137 S. Ct. at 1050-51. Furthermore, we did not rely on ID risk factors as a foundation to counter an ID determination. *See generally Wright*, 213 So. 3d at 899-902; *see Moore*, 137 S. Ct. at 1051. Therefore, the only remaining basis from *Moore* that could even remotely

entitle Wright to relief was an alleged overemphasis on adaptive strengths and improper focus on prison conduct. *Moore*, 137 S. Ct. at 1050.

In *Moore*, one of the reasons that the Supreme Court reversed was because the CCA "overemphasized" the defendant's adaptive strengths. *Id.* The CCA concluded that the defendant's adaptive strengths "constituted evidence adequate to overcome the considerable objective evidence of Moore's adaptive deficits" even though the "medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Id.* The Supreme Court further explained that "the CCA stressed Moore's improved behavior in prison" despite experts' "caution[ing] against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Id.* (quoting DSM-5, at 38). It is uncertain exactly where *Moore* drew the tenuous line of "overemphasis" on adaptive strengths. In fact, that uncertainty spawned the dissent's criticism. *Id.* at 1058-59 (Roberts, C.J., dissenting) ("The Court faults the CCA for 'overemphasiz[ing]' strengths and 'stress[ing]' Moore's conduct in prison, *ante*, at 1050, suggesting that some—but not *too much*—consideration of strengths and prison functioning is acceptable. The Court's only guidance on when 'some' becomes 'too much'? Citations to clinical guides." (alterations in original)). As lawyers, it seems counterintuitive that courts cannot consider certain connected adaptive strengths because the existence of certain connected strengths necessarily illustrates the absence of

- 19 -

certain deficits. *See id.* at 1058-59 (Roberts, C.J., dissenting). For example, common sense dictates that if a defendant excels in algebra, then that fact demonstrates a lack of connected adaptive deficits in math reasoning (i.e., the conceptual domain). *See* DSM-5, at 37. Regardless of where the nebulous line of "overemphasis" is drawn, however, the *Moore* majority noted that "even if clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain, neither Texas nor the dissent identifies any clinical authority permitting the *arbitrary offsetting of deficits against unconnected strengths* in which the CCA engaged." 137 S. Ct. at 1050 n.8 (emphasis added).[8] This clarification strikes at the heart of the Supreme Court's rationale and allows us to conclude that we did not "overemphasize" Wright's adaptive strengths to an extent that ran afoul of *Moore*.[9]

---

8. Ignoring this important qualification, Justice Pariente's opinion reads *Moore* far beyond its holding. Concurring in result op. at 30-31 (Pariente, J.) ("[A]daptive strengths do not overcome adaptive deficits and conduct in prison, a structured environment, should not be relied on . . . ."). The Supreme Court faulted the CCA for "overemphasiz[ing]" or "plac[ing] undue emphasis on adaptive strengths" and "caution[ing] against reliance on" prison conduct. *Moore*, 137 S. Ct. at 1050, 1052 n.9. This guidance, albeit muddled, is clearly a far cry from the bright-line prohibition that Justice Pariente reads into the language. Even after *Moore*, the mention of strengths and prison conduct in an ID opinion is not per se error; but—considering the Supreme Court's warnings—we must ensure our compliance with *Moore*.

9. At this point, we feel the need to express the difficult position that the States are placed in due to the Supreme Court's lack of clear guidance on this analysis. *See Moore*, 137 S. Ct. at 1058-60 (Robert, C.J., dissenting). We are

Our opinion discussed some of Wright's adaptive strengths and behavior in prison, *Wright*, 213 So. 3d at 899-902; whereas, *Moore*, the DSM-5, and AAIDD-11 all caution against overemphasis on that type of evidence. *Moore*, 137 S. Ct. at 1050; DSM-5, at 33, 38; AAIDD-11, at 47. Yet the crux of our decision rested on the competing expert medical testimony of Dr. Gamache and Dr. Kasper instead of independently weighing strengths and deficits or focusing on prison conduct. *Wright*, 213 So. 3d at 899-900. Both experts agreed that Wright does not have sufficient deficits in the practical or social domains. *Id.* With regard to conceptual skills, we merely listed connected facts that Dr. Gamache relied upon to render his medical conclusion that Wright does not have adaptive deficits, which were all relevant and connected to the conceptual domain. *Id.* at 899. Although we discussed further evidence of Wright's abilities, the expert testimony, relevance of

---

asked to interpret and follow two clinical manuals that caution people like us from making untrained ID diagnoses. DSM-5, at 25 ("Use of DSM-5 to assess for the presence of a mental disorder by nonclinical, nonmedical, or otherwise insufficiently trained individuals is not advised."); *see* AAIDD-11, at 85-89. To make matters worse, those manuals occasionally contradict one another. *Compare* DSM-5, at 38 (maintaining relatedness requirement), *with* AAIDD-11, at 6, 8 (removing relatedness requirement). And although we need not follow everything in the latest clinical guide, *Moore*, 137 S. Ct. at 1049, the failure to do so is a potential ground for reversal, *id.* at 1053. This catch-22 that we find ourselves in at times underscores our reliance on expert medical opinions provided below and a postconviction court's corresponding credibility determinations.

the evidence, and case posture all distinguish this case from *Moore*. *See id.* at 899-902.

In *Moore*, the habeas court relied on the expert testimony, based on current medical standards, which established that the defendant had adaptive deficits in all three domains. 137 S. Ct. at 1047. The CCA rejected those findings, making its own findings—based on outdated standards and the "wholly nonclinical *Briseno* factors"—to conclude that the defendant's strengths outweighed the significant deficits apparent in the record. *Id.* at 1047-48, 1053. Conversely, here, the postconviction court relied on contemporary expert medical testimony, weighed the evidence, made credibility determinations, and concluded that Wright does not have adaptive deficits in the conceptual domain. Instead of rejecting the lower court's findings to make our own, we accepted the findings and recited the competent, substantial evidence that supported them. *Wright*, 213 So. 3d at 899-902. Furthermore, much of the evidence that the opinion detailed was directly relevant to the conceptual domain. *See id.* To a large extent, Dr. Gamache's findings with regard to conceptual skills related to Wright's ability to read and write, understand numbers and time, comprehend his current legal circumstances, and conduct monetary transactions prior to incarceration. *Id.* at 899. These findings all directly impact and are connected with adaptive functioning within the conceptual domain. *See* DSM-5, at 37 (identifying "memory, language, reading,

writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations" as hallmarks of the conceptual domain). To the contrary, the CCA used completely unrelated adaptive strengths, such as living on the streets, mowing lawns for money, and playing pool, to outweigh the extensive evidence of adaptive deficits in all three domains. *Moore*, 137 S. Ct. at 1045-47. Accordingly, we conclude that the overemphasis issue, as identified by the Supreme Court in *Moore*, is not present here because we did not arbitrarily offset deficits with unconnected strengths, *see id.* at 1050 n.8; instead, we simply relied on expert testimony with regard to connected adaptive deficits and the postconviction court's credibility determinations.

Likewise, we did not detrimentally rely on strengths that Wright developed in prison to justify our conclusion. *See id.* at 1050. The only portion of *Wright* that touched on prison conduct was our recitation of Dr. Gamache's findings. 213 So. 3d at 899. Again, it is difficult to conclude where the Supreme Court drew the line for reliance on prison conduct as our only guidance is a single sentence "caution[ing] against reliance on adaptive strengths" developed in prison. *Moore*, 137 S. Ct. at 1050.[10] We relied on the credibility determination of the

_____

10. For death defendants who have typically been in prison for some time, this lack of guidance is particularly problematic. For instance, the AAIDD-11 instructs that an adaptive functioning analysis centers on an individual's "present functioning," AAIDD-11, at 54, but it warns against considering prison functioning, *id.*, at 55. Moreover, the AAIDD-11 itself notes that there is a

- 23 -

postconviction court, which was supported by competent, substantial evidence in the form of expert medical testimony. *Wright*, 213 So. 3d at 899-900, 902. In light of those facts, we must conclude that we did not improperly rely on prison conduct.

As further evidence supporting the rejection of Wright's adaptive deficit claim, we noted that Wright gave extensive testimony at his trial, withstood cross-examination, and understood the ramifications of waiving his penalty phase jury during a waiver colloquy. *Wright*, 213 So. 3d at 900-01. Also, we recounted that lay witnesses who knew Wright throughout his life—including his cousin and aunt—testified that he learned to work in a fast-paced shelving job at a grocery store, did not have problems understanding them, and knew how to use the city bus system. *Id.* at 901-02. All of that evidence cuts against a finding of adaptive deficits in the conceptual domain. *See* DSM-5, at 37.

At bottom, Wright's position is less about *Moore* than it is a mere reassertion that his expert, Dr. Kasper, was more reliable than the State's, Dr. Gamache. However, *Moore* did not change our standard of review: we still review a postconviction court's order for competent, substantial evidence, and we neither

---

"growing need for research at the intersection of ID determination and forensic science, especially in relation to the measurement of adaptive behavior of individuals living in prisons." *Id.*

reweigh evidence nor second-guess credibility determinations on appeal. *Supra* p. 4. At the ID hearing, the parties presented all the evidence that they could muster, which resulted in an outcome adverse to Wright. Because that decision was supported by competent, substantial evidence, which we thoroughly detailed, *Wright*, 213 So. 3d at 899-902, we can again conclude that Wright failed to prove adaptive deficits by clear and convincing evidence—a conclusion that *Moore* did not alter. *See Glover*, 226 So. 3d at 809.

## CONCLUSION

Based on the foregoing, we reaffirm the postconviction court's denial of Wright's ID claim.

It is so ordered.

LEWIS, QUINCE, POLSTON, and LABARGA, JJ., concur.
CANADY, C.J., concurs specially.
LABARGA, J., concurs with an opinion, in which CANADY, C.J., and POLSTON, J., concur.
LAWSON, J., concurs specially with an opinion, in which CANADY, C.J., concurs.
PARIENTE, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring.

I fully concur with the majority that Wright is not entitled to relief in light of the Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017). I write separately to emphasize that the majority does not require consideration of the

- 25 -

adaptive deficits prong of the intellectual disability determination where competent substantial evidence supports the circuit court's conclusion that the defendant failed to establish by clear and convincing evidence the significantly subaverage general intellectual functioning prong. Rather, the majority addresses adaptive functioning in response to the remand by the Supreme Court and the assertion by Wright that this Court's earlier decision was in contravention of Supreme Court precedent.

In the broader context, however, I agree with the general proposition that where a defendant has failed to establish any one of the three prongs of the intellectual disability determination by clear and convincing evidence, "the defendant will not be found to be intellectually disabled." *Williams v. State*, 226 So. 3d 758, 768 (Fla. 2017) (quoting *Salazar v. State*, 188 So. 3d 799, 812 (Fla. 2016)), *cert. denied*, 138 S. Ct. 2574 (2018). *Moore* does not alter this premise. Rather, *Moore* followed the holding of *Hall v. Florida*, 134 S. Ct. 1986 (2014), that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error [the SEM (standard error of measurement)], the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 2001. In *Moore*, the Supreme Court reiterated that courts are required to "continue the inquiry and consider other evidence of intellectual disability *where an individual's IQ score, adjusted for the*

*test's standard error, falls within the clinically established range for intellectual-functioning deficits.*" 137 S. Ct. at 1050 (emphasis added).  There, because the defendant's IQ score, adjusted for the SEM, presented a range of 69 to 79, the Texas Court of Criminal Appeals was required to "move on" to consider adaptive functioning.  *Id.* at 1049.

Accordingly, where a defendant fails to demonstrate by clear and convincing evidence that his or her IQ score, when adjusted for the SEM, falls within the clinically established range for significantly subaverage general intellectual functioning, the inquiry need not continue.[11]

CANADY, C.J., and POLSTON, J., concur.

LAWSON, J., concurring specially.

I agree with that portion of the majority opinion explaining the nature and effect of the United States Supreme Court's summary reconsideration order.  I also agree with the majority's conclusion that *Moore v. Texas*, 137 S. Ct. 1039 (2017), has no impact on our review of the trial court's rejection of Wright's assertion that he is intellectually disabled as defined in section 921.137(1), Florida Statutes

---

11.  Of course, nothing prohibits a circuit court from reaching and considering all three prongs, especially in cases involving what may be considered a "close call."  Doing so ensures that if, on appeal, this Court determines competent substantial evidence does not support the trial court's determination as to one prong, we will have a developed record to review the other prongs without reversing and remanding for further proceedings.

(2017).  That statute contains a three-prong test for intellectual disability (ID) as a

bar to imposition of the death penalty.  *Id.* (defining ID as "significantly

subaverage general intellectual functioning existing concurrently with deficits in

adaptive behavior and manifested during the period from conception to age 18").

"If the defendant fails to prove any one of these components, the defendant will not

be found to be intellectually disabled."  *Salazar v. State*, 188 So. 3d 799, 812 (Fla.

2016).[12]  As explained in our March 16, 2017, opinion in this case, Wright failed to

prove the first prong of the ID test, "that he is of [significantly] subaverage

intellectual functioning . . . [and for] this reason alone, Wright does not qualify as

intellectually disabled under Florida law."  *Wright v. State*, 213 So. 3d 881, 898

(Fla. 2017).

The majority opinion properly explains that "*Moore* does not substantially

change the law with regard to consideration of intelligence or IQ for the purposes

of an ID determination."  Majority op. at 7.  In *Moore*, the Texas Court of Criminal

Appeals (CCA) had applied its prior precedent in *Ex parte Briseno*, 135 S.W.3d 1

(2004), to reject the lower court's finding that Moore did possess significantly

subaverage intellectual functioning (the first ID prong).  *Moore*, 137 S. Ct. at 1046-

47.  The United States Supreme Court rejected the CCA's conclusion as

_____

12. *Salazar* is a unanimous per curiam decision from this Court, decided after *Hall v. Florida*, 134 S. Ct. 1986 (2014).

- 28 -

"irreconcilable" with *Hall*, which "instructs that, where an IQ score is close to, but above, 70, courts must account for the test's standard error of measurement." *Id.* at 1049 (internal quotation marks omitted). In this case, by contrast, both the trial court and this Court did account for the standard error of measurement (SEM) when concluding that Wright failed to establish significantly subaverage intellectual functioning. *Wright*, 213 So. 3d at 897-98.

To the extent that the majority believes that *Moore* requires consideration of the second ID prong—deficits in adaptive functioning—when, *after giving full consideration to the SEM as directed by Hall*, the trial court properly concludes that the defendant has failed to prove the first prong, I disagree with the majority opinion. In *Moore*, the Supreme Court only addressed the second prong, adaptive functioning, because the defendant met his burden to establish the first prong. *See Moore*, 137 S. Ct. at 1049 ("Because the lower end of Moore's score range falls at or below 70 [when adjusted for the SEM], the CCA had to move on to consider Moore's adaptive functioning."). In contrast, because Wright's failure to establish significantly subaverage intellectual functioning (after accounting for the SEM) ends the ID inquiry, it should also end our analysis—as we have held in another post-*Moore* case. *See Quince v. State*, 241 So. 3d 58, 62 (Fla. 2018) (holding that "specific factual findings as to whether [the defendant] had established that he meets either the second or third prongs of the intellectual disability standard . . .

- 29 -

were unnecessary . . . because [where the defendant] failed to meet the significantly subaverage intellectual functioning prong (even when SEM is taken into account), he could not have met his burden to demonstrate that he is intellectually disabled").

However, I fully concur in the result in this case.

CANADY, C.J., concurs.

PARIENTE, J., concurring in result.

The important holding of the United States Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017), is that adaptive strengths do not overcome adaptive deficits and conduct in prison, a structured environment, should not be relied on in assessing adaptive functioning. *Id.* at 1050. These directives from the United States Supreme Court come from a consensus within the medical community as pointed out in *Moore. Id.*[13] However, I agree with the per curiam opinion that "*Moore* does not require a different result in this case." Majority op. at 2.

---

13. The two medical diagnostic standards relied on in *Moore* are the DSM and the AAIDD, current editions. "DSM-5" refers to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association. Additionally "AAIDD-11" refers to the eleventh edition of the American Association on Intellectual and Developmental Disabilities clinical manual. Both are considered the "current medical diagnostic standards." *Moore*, 137 S. Ct. at 1045.

While we discussed adaptive strengths in our now-vacated opinion in *Wright v. State*, 213 So. 3d 881 (Fla. 2017), we did not rely on the discussion of adaptive strengths to affirm the denial of Wright's intellectual disability claim. Additionally, our opinion briefly discussed Wright's conduct while in prison. *Id.* at 901-02. While there is nothing wrong with mentioning either adaptive strengths or conduct in prison, it is improper to rely on either factor to overcome the evidence of adaptive deficits to deny a defendant's intellectual disability claim. As the per curiam opinion notes, "*Moore*, the DSM-5, and AAIDD-11 all caution against overemphasis on that type of evidence." Majority op. at 21 (citing *Moore*, 137 S. Ct. at 1050; DSM-5, at 33, 38; AAIDD-11, at 47).

Nevertheless, I urge trial courts analyzing intellectual disability claims post-*Moore* to focus on the adaptive deficits and not to fall into the pitfalls of analyzing either adaptive strengths or deficits in the context of a prison environment. As the United States Supreme Court explained:

> In concluding that Moore did not suffer significant adaptive deficits, the CCA[14] overemphasized Moore's perceived adaptive strengths. The CCA recited the strengths it perceived, among them, Moore lived on the streets, mowed lawns, and played pool for money. *See* [*Ex parte Moore*,] 470 S.W.3d [481,] 522-523, 526-527 [(Tex. Crim. App. 2015)]. Moore's adaptive strengths, in the CCA's view, constituted evidence adequate to overcome the considerable objective evidence of Moore's adaptive deficits, *see supra*, at 1045; App. to Pet.

_____

14. "CCA" refers to the Texas Court of Criminal Appeals, Texas' court of last resort in criminal cases. *Moore*, 137 S. Ct. at 1044 n.1.

for Cert. 180a-202a. *See* 470 S.W.3d, at 522-524, 526-527. But the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*. *E.g.*, AAIDD-11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits); *see Brumfield* [*v. Cain*], 135 S. Ct. [2269], 2281 [(2015)] ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.' " (quoting AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002))).

In addition, the CCA stressed Moore's improved behavior in prison. 470 S.W.3d, at 522-524, 526-527. Clinicians, however, caution against reliance on adaptive strengths developed "in a controlled setting," as a prison surely is. DSM-5, at 38 ("Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained."); *see* AAIDD-11 User's Guide 20 (counseling against reliance on "behavior in jail or prison").

*Moore*, 137 S. Ct. at 1050.

The holding of *Moore* is consistent with the views expressed in my concurring in part, dissenting in part opinion in *Dufour v. State*, 69 So. 3d 235 (Fla. 2011), joined by Justice Quince and former Justice Perry. In that opinion, I explained the pitfalls of over-emphasizing a defendant's adaptive strengths and conduct exhibited while incarcerated:

Specifically, the AAIDD and the DSM-IV stress that the focal point of adaptive behavior should be on the individual's limitations rather than demonstrated adaptive skills. An important reason for this policy is that "[t]he skills possessed by individuals with [intellectual disability]

- 32 -

vary considerably, and the fact that an individual possesses one or more that might be thought by some laypersons as inconsistent with the diagnosis (such as holding a menial job, or using public transportation) cannot be taken as disqualifying." James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 27 Mental & Physical Disability L. Rep. 11, 21 n.29 (2003).

The AAIDD, in its amicus brief to this Court, explains that the significant limitations in adaptive behavior must be based on objective measurements and not weighed against adaptive strengths. The purpose of the adaptive functioning prong is to ascertain whether the measured intellectual score reflects a real-world disability, as opposed to a testing anomaly. Thus for this prong, the diagnostician's focus must remain on the presence of confirming deficits. Accordingly, the AAIDD has specifically noted that "assessments must . . . assume that limitations in individuals often coexist with strengths, and that a person's level of life functioning will improve if appropriate personalized supports are provided over a sustained period." Am. Ass'n on Intellectual & Developmental Disabilities, *Definition of Intellectual Disability*, http://www.aaidd.org/content_100.cfm?navID=21 (last visited Jan. 14, 2011). Further, as the AAIDD correctly explains, much of the clinical definition of adaptive behavior is much less relevant in prisons, and in fact, a person with [intellectual disability] is likely to appear to have stronger adaptive behavior in a structured environment such as a prison than in society. The amicus brief of the AAIDD further points out that "[s]tereotypes and lay assumptions about people with [intellectual disability] can cloud or distort individual assessment."

The failure to take an objective approach to deficits in adaptive behavior can result in the perpetuation of misunderstanding [intellectual disability].

*Id.* at 258 (Pariente, J., concurring in part and dissenting in part).

In this case, however, I agree with the per curiam opinion that "the crux of

our decision [in *Wright*] rested on the competing expert medical testimony of Dr.

Gamache and Dr. Kasper instead of independently weighing strengths and deficits

- 33 -

or focusing on prison conduct." Majority op. at 21. This Court, in affirming the postconviction court's denial of relief, relied primarily on the competent, substantial evidence presented through the testimony of both experts who agreed that Wright does not have sufficient deficits in the practical or social domains and the competing testimony presented with respect to the conceptual domain. Majority op. at 21.

Regardless of how this Court explained Wright's intellectual disability claim in its prior opinion, it is clear that the postconviction court properly analyzed Wright's claim. As the per curiam opinion aptly notes, "Wright's position is less about *Moore* than it is a mere reassertion that his expert, Dr. Kasper, was more reliable than the State's, Dr. Gamache." Majority op. at 24. For these reasons, I concur in result but do not agree with the unnecessary discussion of adaptive strengths and prison behavior.

An Appeal from the Circuit Court in and for Polk County,
Donald G. Jacobsen, Chief Judge - Case No. 532000CF002727A0XXXX

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Maria Christine Perinetti, Raheela Ahmed, Lisa Marie Bort, and Margaret S. Russell, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, Tampa, Florida,

     for Appellee