# Third District Court of Appeal
## State of Florida

Opinion filed December 22, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D22-1451
Lower Tribunal No. F13-17684A
_____

**State of Florida,**
Appellant,

vs.

**Reginald Jackson,**
Appellee.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, Ellen Sue Venzer, Judge.

James Uthmeier, Attorney General, and Jennifer A. Davis, Assistant Attorney General, for appellant.

Law Office of Todd G. Scher, P.L., and Todd G. Scher (Hollywood); Melissa Ortiz, P.A., and Melissa Ortiz; G.P. Della Fera, for appellee.

Before EMAS, LINDSEY and LOBREE, JJ.

LOBREE, J.

The State of Florida appeals a non-final order granting defendant

Reginald Jackson's motion to determine intellectual disability under section 921.137(1), Florida Statutes (2017), and Florida Rule of Criminal Procedure 3.203, as a bar to the potential imposition of the death penalty. We have jurisdiction. See Art. V, §4(b)(1), Fla. Const.; § 921.137(7), Fla. Stat.; Fla. R. App. P. 9.140(c)(1)(I); see also State v. Victorino, 372 So. 3d 772, 776 (Fla. 5th DCA 2023) (stating that "district courts may lawfully consider challenges to interlocutory orders in death penalty cases"). The State contends that the trial court misconstrued the record, which lacks clear and convincing evidence to support its order, and considered factors other than those required to prove intellectual disability. Further, the State challenges the evidence of deficits in Jackson's current level of adaptive behavior or function, contending that the trial court only focused on evidence from his childhood. Jackson answers that there is competent, substantial evidence to support the trial court's factual findings, to which a reviewing court must yield. We agree and affirm.

## BACKGROUND

Jackson is charged by indictment with two counts of first-degree murder and related armed robbery, kidnapping, and burglary offenses for the 2013 killings of Annette Anderson and her grandson Tyrone Walker. Both victims were found prone, bound, and gagged, with gunshot wounds to the

2

back of their heads. The State contends that evidence placed Jackson at the scene of the homicides and a distinct vehicle like his was captured on surveillance at each scene where stolen credit or bank cards were used. After the State announced its intention to seek the death penalty, Jackson moved for an order barring him from eligibility for capital punishment, contending that he qualifies as an intellectually disabled person under section 921.137 and rule 3.203.

The trial court conducted an evidentiary hearing on this motion on six non-consecutive days beginning on October 29, 2019. Jackson presented testimony of two lay witnesses, his grandmother Dorothy Jackson and his ninth-grade teacher, Juli Suarez Burgos, and four experts, Dr. Marc Tasse, Dr. Michelle Quiroga, Dr. Caroline Everington, and rebuttal witness Dr. Daniel Reschly. The State called two lay witnesses, Officer Alberto Acosta and Special Agent Rafael Fernandez, Jr., and two experts, Dr. Michael Brannon and Dr. Gregory Pritchard, and presented evidence regarding Jackson's conduct during the alleged offenses, his arrest, court hearings, jail calls, and while in custody. After hearing testimony and reviewing hundreds of pages of school, jail, and juvenile detention records, and other documents, as well as detailed post-hearing memoranda the parties submitted, the trial court rendered a fifteen-page written order finding Jackson intellectually

3

disabled.  This appeal follows.

## STANDARD OF REVIEW

In reviewing the trial court's determination that Jackson is intellectually disabled, this court must "examine[] the record for whether competent, substantial evidence supports the determination of the trial court.  This [c]ourt does not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." Haliburton v. State, 331 So. 3d 640, 646 (Fla. 2021) (quoting State v. Herring, 76 So. 3d 891, 895 (Fla. 2011)) (cleaned up); see also Spires v. State, 180 So. 3d 1175, 1180 (Fla. 3d DCA 2015) ("As the Florida Supreme Court stated in Herzog v. Herzog, 346 So. 2d 56, 57 (Fla. 1977) . . .  so long as there is competent substantial evidence to support the trial court's findings, the reviewing court must yield.").

## ANALYSIS

Atkins v. Virginia, 536 U.S. 304, 317, 321 (2002), held that the Eighth and Fourteenth Amendments to the United States Constitution forbid the execution of persons with intellectual disability,[1] but left to the states the task of developing appropriate ways to enforce this restriction upon their

---

[1] "[T]he terms 'intellectual disability' or 'intellectually disabled' are interchangeable with and have the same meaning as the terms 'mental retardation' or 'retardation' and 'mentally retarded' as those terms were defined before July 1, 2013."  § 921.137(9), Fla. Stat.

execution of sentences. Section 921.137(1) and rule 3.203(b) define "intellectual disability" to mean: 1) significantly subaverage general intellectual functioning; 2) existing concurrently with deficits in adaptive behavior; and 3) manifested during the period from conception to age 18. "[I]f a defendant fails to prove that he or she meets any one of the three prongs of the intellectual disability standard, he or she will not be found to be intellectually disabled." Phillips v. State, 299 So. 3d 1013, 1024 (Fla. 2020). "If the court finds, by clear and convincing evidence, that the defendant has an intellectual disability as defined in subsection (1), the court may not impose a sentence of death and shall enter a written order that sets forth with specificity the findings in support of the determination." § 921.137(4), Fla. Stat.

The Florida Supreme Court has defined "clear and convincing evidence" as an "intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." Haliburton, 331 So. 3d at 650 (quoting In re Davey, 645 So. 2d 398, 404 (Fla. 1994)). "Clear and convincing evidence means evidence that is precise, explicit, lacking in confusion, and of such weight that it produces

5

a firm belief, without hesitation, about the matter in issue." Dufour v. State, 69 So. 3d 235, 245 (Fla. 2011). Here, the trial court expressly found that Jackson proved, by clear and convincing evidence, that he has an intellectual disability under section 921.137(1). Thus, we examine the record evidence supporting this finding on each prong.

*Intellectual Function and Age of Onset*

Medical witnesses agree that "significantly subaverage general intellectual functioning" is reflected by intelligence quotient ("IQ") testing below seventy. In Hall v. Florida, 572 U.S. 701, 723 (2014), the Supreme Court "agree[d] with medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Thus, Florida courts considering the results of intellectual functioning tests must take into account the standard error of measurement ("SEM") of IQ tests, which is ±five points. Id. at 724.

School records reflect that Jackson's IQ was tested beginning at age seven in 1992, where he received a full-scale score of 76, with a performance score of 64 and a verbal score of 91. The 27-point disparity between the subtest scores was considered evidence to question the reliability of this

6

score.  In 1994, at age eight or nine, his IQ testing reflected a full-scale score of 72 (performance score of 71 and verbal score of 78).  The trial court noted that taking the five-point SEM into account, Jackson's score may have been as low as 67.  In 2019, post-arrest, Jackson's testing disclosed a full-scale score of 63,[2] although evidence was presented that a defendant in custody may be affected by depression.  The trial court noted that this score was consistent with Jackson's 1994 IQ test.

Dr. Everington opined that Jackson meets the criteria for this prong. Notably, even the State's expert Dr. Brannon scored Jackson as having a full-scale IQ score of 63.  Thus, experts for both parties considered Jackson to be of "subaverage general intellectual functioning."  In addition, the trial court also relied on data from Jackson's individualized education plans and other academic testing records that indicate that Jackson suffered from significant deficits.  The trial court emphasized that none of his school records show that he ever surpassed the academic level of a sixth grader. Accordingly, we conclude that the trial court's finding that Jackson established that he has significantly subaverage general intellectual functioning is supported by competent, substantial evidence in the record.

---

[2] The trial court expressly declined to consider results of IQ testing by Dr. Quiroga, finding them lacking in credibility.

We also conclude that competent, substantial evidence supports the trial court's finding that Jackson established the third prong. Records confirm that Jackson was born while his mother was actively abusing drugs. Jackson's school records contain references to him being a "crack baby." Jackson's father beat his mother, both during and after pregnancy. Jackson also suffered from several head injuries during the developmental period. At age nine, he fell from a shed and required clamps on the back of his head. At fourteen, he was hit by a car and his head struck the pavement. Jackson's ninth grade multidisciplinary report refers to him suffering from seizures. At sixteen, Jackson was in a car accident, lost consciousness, and spent four days in the hospital. The trial court noted that even the State's expert, Dr. Brannon, acknowledged that Jackson suffered neurological problems and difficulties due to his mother's drug and alcohol use during her pregnancy.

Jackson's school records established that he had two full-scale IQ scores on school-administered testing that were low enough to require further adaptive functioning analysis. While the school records did not reflect a formal diagnosis of intellectual disability as a child, Jackson was placed in individualized education plans for students considered to be "emotionally handicapped." In Oats v. State, 181 So. 3d 457, 469 (Fla. 2015), the court clarified that section 921.137(1) only requires that intellectual disability be

demonstrated to have manifested before age eighteen, not that it be diagnosed at that time.

*Adaptive Function*

The second criterion for intellectual disability–existing concurrently with deficits in adaptive behavior–is central here, both as to the parties' dispute and the views of the relevant professional community. "Adaptive behavior," for the purpose of the intellectual disability definition, means the "effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." Phillips, 299 So. 3d at 1018 (quoting § 921.137(1)). "[A]n individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so, is central to the framework followed by psychiatrists and other professionals in diagnosing intellectual disability." Hall, 572 U.S. at 705 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33, 37 (5th ed. 2013) ("DSM–5")).

> The DSM-5 divides adaptive functioning into three broad categories or "domains": conceptual, social, and practical. DSM-5, at 37; see also AAIDD-11,[3] at 43. The conceptual domain

---

3 American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010).

9

"involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations." DSM-5, at 37. The social domain "involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment." Id. The practical domain "involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization." Id. According to the DSM-5, adaptive deficits exist when at least one domain "is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." Id. at 38; see AAIDD-11, at 43.

Haliburton, 331 So. 3d at 648 (quoting Wright v. State, 256 So. 3d 766, 773

(Fla. 2018)). In evaluating adaptive deficits

the trial court does not weigh a defendant's strengths against his limitations in determining whether a deficit in adaptive behavior exists. Rather, after it considers "the findings of experts and *all other evidence*," Fla. R. Crim. P. 3.203(e), it determines whether a defendant has a deficit in adaptive behavior by examining evidence of a defendant's limitations, as well as evidence that may rebut those limitations.

Haliburton, 331 So. 3d at 651 (quoting Dufour, 69 So. 3d at 250). Here, the

trial court noted that Jackson needs to be deficient in one of the three

domains to satisfy the second prong of the intellectual disability test and

found him to be deficient in two domains.

The trial court considered Adaptive Behavior Assessment System,

Third Edition ("ABAS") assessments, an independent living assessment, and

a language test administered by Dr. Everington. On the two ABAS assessments, when compared to those of a similar age, Jackson performed below the first percentile. On the Independent Living Scales assessment, Jackson's score was borderline compared to others with intellectual disabilities. His language test showed scores all substantially below average. The trial court recognized Dr. Everington's testimony that these tests, conducted while Jackson was incarcerated, are retrospective evaluations. Accordingly, the trial court looked to other testimony and evidence to corroborate these scores.

## A. Conceptual Domain

The trial court found that Jackson was substantially deficient in functional academics. Various witnesses highlighted his academic challenges. Suarez Burgos, a special education teacher of 25 years who was Jackson's teacher in his emotionally handicapped ninth grade class, opined that he was low functioning. She gave him classwork meant for a much lower grade level to prevent him from being frustrated. She said that Jackson could understand "black and white" issues but lacked higher level abstract thinking. She related that she would give Jackson three-part instructions, and he could only remember one. Suarez Burgos testified that Jackson could read but not comprehend what he was reading. She related

that he struggled to focus on tasks and needed constant redirection.

Jackson's sister told Dr. Everington that she would send Jackson to the store with a list of three items, and he would call her several times to ask what he needed to buy. Jackson's former girlfriend advised Dr. Everington that it "took him a while to learn new things." Jackson's uncle told Dr. Everington that he was "lower functioning" than other children in the family.

Jackson's sister related to Dr. Everington that his grandmother Dorothy would read his mail to Jackson, and then explain to him what it meant. Dorothy Jackson testified that Jackson lived with her until his teenage years. She testified that he did not know how to tell time as a seven-year-old, struggled to count money, and could not write his name at age five. Dorothy Jackson testified that he could not complete tasks and had difficulty controlling his feelings. Dr. Everington testified that these are characteristics of severe deficits in self-direction.

The trial court found that these deficits indicate that Jackson is deficient in his self-direction and functional academics, and thus inadequate in the conceptual domain of adaptive behavior. The court also relied on his failure to complete high school or obtain a GED. Based on the testing and this evidence, there is competent substantial evidence to support the trial court's conclusion that Jackson is deficient in the conceptual domain.

12

## B. Social Domain

The trial court recognized that the social domain includes a person's interpersonal skills and social judgment. The trial court found that the defense failed to establish that Jackson is incompetent in this domain, based on the State's evidence about Jackson's interaction with Officer Acosta at a traffic stop, and evidence of his cell phone and jail calls. The trial court also found that in his post-Miranda[4] statement in this case, Jackson was cooperative and pushed for sympathy from the investigators. It noted instances during the interview that demonstrate Jackson is capable of observing social cues and acting based on those indicators, aware of the consequences of being defiant, and able to think logically when placed in these situations. The trial court found that testimony regarding Jackson's use of *67 to block his caller ID, as well as jail calls recording Jackson using complex words and discussing politics and how the governor had not voted on a bill presented to him, was indicative of this competency. The trial court found that these are all clear indications of competency in the social domain.[5]

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

[5] The trial court's order does not address the concession of State expert Dr. Pritchard that Jackson has adaptive deficits in the social domain. However, Dr. Pritchard did not ascribe these deficits to intellectual disability, but rather opined that Jackson has ADHD.

While the trial court found that Jackson had no substantial deficiencies in the social domain, it noted that this did not foreclose a finding that the second prong had been established as Jackson had deficiencies in the other domains.

## C. Practical Domain

The trial court noted that the practical domain is classified by the ability to work, maintain one's health and safety, and home living skills. According to Dr. Everington, this area could be characterized by looking after one's needs, avoiding unsafe situations, and refraining from dangerous behavior. The trial court found Jackson to be significantly deficient in this domain.

The trial court found that the only evidence of employment during Jackson's lifetime was work as a restaurant busboy for two weeks in his youth. Further, Jackson has apparent deficits in the area of health and safety. The trial court found that the evidence shows that Jackson has been unsuccessful in this area. According to Dorothy Jackson, he could not be trusted to keep a medication schedule or take care of his own medical needs. Dr. Everington reported that his sister related that Jackson had to be reminded to bathe and would wear the same clothes for days in a row.

The trial court found that Jackson is also deficient in the area of home living skills and is not capable of living alone. Dorothy Jackson testified that

14

as a child he was not permitted in the kitchen out of fear that he would hurt or injure himself. She added that he did not know how to make simple meals and his chore when growing up was to take out the trash, which he often had to be reminded to do. Jackson's sisters packed his school supplies and got him ready for school daily. Dorothy Jackson testified that in later years Jackson would always live with girls, who she believed supported him. Dr. Everington also learned this from various sources, testifying that after living with one of them, he'd return to live with his sister, grandmother, or his mother.

Officer Acosta testified that Jackson knew how to drive, although he never had a driver's license.[6] Yet Jackson's family related to Dr. Everington that no one would get in the car with Jackson as he was an "awful driver," could not follow directions, and would easily get lost, even within his neighborhood.

Jackson could use a cell phone. The State's expert who retrieved messages from his phone was unable to verify that Jackson was the one actively using it. Sanchez Burgos testified that even children with severe

---

[6] Dr. Reschly testified from his review of records that Jackson told someone, possibly Dr. Brannon, that he did not think he could pass his driver's license test. In 1998, Jackson paid somebody $300 to get him a driver's license, and what he ended up with was an ID card.

15

intellectual disabilities know how to use a cell phone and send texts. Jackson did not purchase this phone or pay a monthly phone bill.

The trial court found that Jackson failed to maintain personal hygiene, could not support himself, looked to others to do so for him, had no known bank accounts and did not hold a driver's license. The trial court concluded that because Jackson had proven deficiencies in two of the three domains of adaptative function, the second prong of the intellectual disability test was established.

The State's argument with respect to Jackson's adaptive functioning emphasizes that the first prong of intellectual disability (subaverage intelligence) must exist "concurrently" with the second prong, "which [the Florida Supreme Court] has interpreted to mean that subaverage intellectual functioning must exist at the same time as the adaptive deficits, and that there must be *current* adaptive deficits." Dufour, 69 So. 3d at 248 (citing Jones v. State, 966 So. 2d 319, 326 (Fla. 2007) (emphasis added)). The State contends that the trial court erred by failing to identify Jackson's adaptive deficits that currently exist. Jackson responds that the holding in Hall changed this analysis, as "the law requires that he have the opportunity to present evidence of his intellectual disability, *including deficits in adaptive functioning over his lifetime.*" Hall, 572 U.S. at 724 (emphasis added).

16

Jackson concedes that in 2018, the Florida Supreme Court continued to apply its interpretation that "concurrently" means that the two prongs must exist at the same time and "there must be current adaptive deficits." Wright, 256 So. 3d at 773 (quoting Dufour, 69 So. 3d at 248). We need not weigh into this dispute as the trial court expressly recognized that adaptive deficits must not only be present during childhood and adolescence, but also that impairment must be an ongoing issue. This finding is supported by competent substantial evidence.

Dr. Everington concluded that Jackson met the adaptive deficits prong. Dr. Brannon disagreed with this opinion, instead placing emphasis on Jackson's prison behavior in concluding that prong two was not satisfied. The State criticizes the trial court's reliance on testing and Jackson's historical evidence of his deficits, contending that the record shows that Jackson's independent actions demonstrate his current ability to engage in well-thought-out actions to avoid arrest and participate in and understand legal proceedings. See Wright, 256 So. 3d at 776 (recognizing that to lawyers, "it seems counterintuitive that courts cannot consider certain connected adaptive strengths because the existence of certain connected strengths necessarily illustrates the absence of certain deficits"). Yet after it considered the findings of experts and all other evidence, the trial court

properly examined all the evidence when determining that Jackson has a deficit in adaptive behavior by examining evidence of his limitations, as well as the State's evidence that may rebut those limitations. See Haliburton, 331 So. 3d at 651. As the trial court's holistic inquiry and factual findings are supported by competent, substantial evidence, we affirm its conclusion that Jackson has proved by clear and convincing evidence that he is intellectually disabled under section 921.137(1).

Affirmed.